**T–MOBILE US, INC., et al., Plaintiffs,**

v.

**AIO WIRELESS LLC, Defendant.**

**Civil Action No. H–13–2478.**

United States District Court,
S.D. Texas,
Houston Division.

Signed Jan. 22, 2014.

Filed Feb. 3, 2014.

Joseph Beauchamp, Jones Day, Houston, TX, Bradley I. Ruskin, Brendan Orourke, Erika Marie Stallings, Kevin J. Perra, Victoria L. Loughery, Proskauer Rose LLP, New York, NY, Jessica D. Bradley, Tracy A. Stitt, Jones Day, John G. Froemming, Washington, DC, for Plaintiffs.

Charles H. Hooker, III, Jennifer Fairbairn Deal, R. Charles Henn, William H. Brewster, Kilpatrick, Townsend & Stockton LLP, Atlanta, GA, Mark Ryan Trachtenberg, Haynes and Boone, LLP, Houston, TX, for Defendant.

## MEMORANDUM OPINION* SETTING OUT FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

LEE H. ROSENTHAL, District Judge.

The plaintiffs, T–Mobile US, Inc., T–Mobile USA, Inc., and Deutsche Telekom AG (together, "T–Mobile"), moved for a preliminary injunction to stop the defendant, Aio Wireless LLC, from using a plum color as a central part of its trade dress for consumer wireless telecommunications services and products. Telecommunications companies use color as an integral part of elaborate marketing campaigns to identify the sources for various consumer products and services. Familiar examples include "Verizon red," "Sprint yellow," "AT & T orange," and "T–Mobile magenta."

T–Mobile seeks to protect its trademarked use of magenta from what it alleges is Aio's infringing use of a confusingly similar plum color.

The products and services at issue are wireless cellular phone communications not tied to particular devices or to long-term contracts with particular carriers. Such no-contract services are relatively new and the competition among service providers is intense. Aio is a new AT & T subsidiary competing with T–Mobile in this area. Aio's launch of its initial marketing campaign prominently features large blocks or swaths of its plum color. T–Mobile's marketing prominently features large blocks or swaths of its magenta color. T–Mobile alleges that AT & T's plum—Pantone 676C—is so close to T–Mobile's trademarked magenta—Pantone Process Magenta—that it infringes the T–Mobile mark, dilutes its strength, and likely causes confusion among consumers. Aio responds by attacking the validity of T–Mobile's magenta mark and denying that it has acquired secondary meaning. Aio also argues that the marketing changes it has made since this suit was filed, greatly reducing its use of the plum color, moot the issues.

Both sides have provided the court with excellent briefs on the legal issues and thorough submissions substantiating their factual claims. Based on the pleadings, the application for the preliminary injunction and the response, the extensive briefing and submissions, the testimony, arguments, and exhibits presented at the three-day evidentiary hearing, the post-hearing briefs and submissions, and the applicable law, the court enters findings of fact and conclusions of law. Based on the findings and conclusions, the court grants the motion for a preliminary injunction on the

---

* Editor's Note: Redactions by the court.

1. Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

terms and conditions set out below, which take into account the marketing changes Aio made during this litigation.

## I. Procedural Background: The Evidence in the Record

T–Mobile filed its complaint on August 23, 2013. (Docket Entry No. 1). On September 4, 2013, T–Mobile filed an amended complaint, motion for preliminary injunction, and motion for expedited hearing on that motion. (Docket Entry Nos, 18, 19, & 24). The motion for preliminary injunction included expert reports from Dr. Susan Schwartz McDonald, a survey research and marketing expert who advises companies on brand strategy and marketing; Sarah Butler of NERA economic consulting, who researches and provides marketing analyses of consumers' decisionmaking processes; and Dr. Bruce Isaacson of MMR Strategy Marketing, who is an expert in survey research and marketing. (Docket Entry No. 20, Exs. 3–5). On September 13, 2013, in a videoconference hearing with all parties, the court set a scheduling order with deadlines for completing fact and expert discovery and for filing briefs, and with a date for a preliminary injunction hearing. (Docket Entry No. 46).[2] The schedule was followed with minor deviations.

On November 1, 2013, Aio filed its opposition brief. (Docket Entry No. 76). Aio supported its opposition with declarations from Dr. Robert A. Paterson, who specializes in marketing and survey research; and reports from Dr. Erich Joachimsthaler, who has been a professional in the brand and marketing field for more than 20 years; Dr. Daniel J. Howard, an expert in the empirical study of marketing; Dr. Roy S. Berns, a "color scientist"; and Dr. Michael J. Tarr, an expert in visual perception and cognition. Aio also attached the declaration and deposition of Dr. Shari Seidman Diamond, a Professor of Law and Psychology at Northwestern University. (Docket Entry No. 77, Exs. 1–9). With its reply brief, T–Mobile submitted a supplemental report from Sarah Butler and a report from Dr. Dhruv Grewal, an expert on value-based marketing and marketing research. (Docket Entry No. 89, Exs. 39, 41). The court permitted Aio to submit supplemental reports from Dr. Howard, Dr. Tarr, Dr. Berns, and Dr. Joachimsthaler. (Docket Entry Nos. 95–98).

A three-day evidentiary hearing was held from November 12 to November 14, 2013. At the evidentiary hearing, the court heard testimony from T–Mobile's Senior Vice–President of Brand & Advertising, Peter DeLuca. The parties argued the inferences to be drawn from the extensive evidence on how the parties and industry use color in their trade dress and marketing.[3]

At the end of the three-day hearing, the court announced its tentative ruling that T–Mobile had established secondary meaning in its magenta mark and that Aio's use of broad swaths or blocks of plum was confusingly similar and infringing. The court also indicated that it was considering

**2.** Under that order, fact-witness depositions were to be completed by October 16, 2013, T–Mobile's supplemental brief in support of its motion for preliminary injunction was due by October 17, 2013, Aio's expert reports were due on October 18, 2013, expert-witness depositions were to be completed by October 25, 2013, Aio's opposition to the motion for preliminary injunction was due on October 30, 2013, and T–Mobile's reply brief was due on November 7, 2013.

**3.** In addition to the reports, declarations, and deposition excerpts, the court admitted a previously excluded rebuttal report from T–Mobile's expert, Dr. Donald Hoffman. (Tr. 71). Aio stated that it did not object to admitting that report. (*Id.*).

a more limited injunction than T–Mobile sought, directed to Aio's use of large swaths of its plum color rather than to all uses of the color.

After the evidentiary hearing, Aio filed a supplemental brief outlining changes in its advertising and store appearance. Aio argued that those changes made T–Mobile's expert reports and consumer surveys obsolete and mooted the issues. T–Mobile responded that voluntary cessation of the infringing activity did not moot the claims. First, absent a court-ordered injunction, T–Mobile had no assurance that the infringing activity would not resume. Second, T–Mobile argued that the changes were insufficient to avoid infringement. Third, T–Mobile argued that the changes both conceded infringement and showed a lack of substantial harm to Aio should the injunction issue.

The court ordered the parties to answer specific questions about the extent and effect of Aio's marketing changes on T–Mobile's claim for injunctive relief. Aio's response emphasized that it objected to any injunction, "even one that tracks changes already being made by the business." (Docket Entry No. 128 at 2). Aio also asked that any injunction be stayed pending an interlocutory appeal to the Fifth Circuit.

For the reasons that follow, the court finds and concludes that T–Mobile magenta has acquired secondary meaning in the marketplace and that T–Mobile has demonstrated a substantial likelihood of success on the merits of its unfair-competition claim under the Lanham Act. The court finds and concludes that Aio's use of broad swaths or blocks of its plum color will likely cause confusion between Aio and T–Mobile and that the loss of goodwill and potential customers poses a substantial threat of irreparable injury to T–Mobile that outweighs the costs Aio will incur

from the injunction. The injunction, issued under separate order, is limited to Aio's use in marketing of large swaths or blocks of its plum color that dominate Aio's advertisements, websites, and stores when Aio launched its marketing. This limited scope, and Aio's posthearing marketing changes, together lead the court to find that the impact on Aio does not weigh against the injunction's issuance. Finally, the court concludes that the injunction serves the public interest in upholding the mark protections provided by the Lanham Act.

### Findings of Fact

### II. The Industry

Within the consumer wireless-telecommunications industry, the major product and service providers use colors as important source indicators in their marketing. (Decl. of Peter DeLuca ¶ 29). Particular colors are an important part of each provider's visual brand identity and trade dress. (*Id.*, Exs. 32, 33). The association of specific colors to certain providers is so common that these providers use those colors to make interbrand comparisons. (*Id.*, Ex. 34). The record contains evidence that T–Mobile runs advertisements comparing itself to its competitors using color to represent a few competitor companies, confident that consumers associate those specific colors with the specific brands. A T–Mobile holiday commercial in December 2012 shows a line of Christmas stockings, each colored with a shade of blue, yellow, red, and magenta; these colors are associated with the major competitors in the wireless telecommunications industry, AT & T, Sprint, Verizon, and T–Mobile. (*Id.*, Ex. 17). An advertisement that ran during the fall 2012 election season showed a line of voting booths, each with a different color curtain: blue, yellow, red, and magenta. The tag line: "Vote Magenta." (*Id.*, Ex. 16). T–Mo-

bile's major competitors operate similarly. At the evidentiary hearing, T–Mobile played a Verizon commercial using colors identified with particular wireless telecommunications providers to symbolize and differentiate the major competing brands. (Plaintiff's Hearing Ex. 1). Exhibits to DeLuca's declaration show an Alltell Wireless commercial in which T–Mobile is represented by a character wearing a magenta shirt. An advertisement put out by companies opposed to a potential merger of AT & T and T–Mobile showed a large man smoking a cigar and wearing a magenta dress. (DeLuca Decl., ¶¶ 31, 33, Exs. 35, 37).

At the evidentiary hearing, T–Mobile's Senior Vice–President of Brand & Advertising, Peter DeLuca, testified about the use and importance of color in the wireless-telecommunications industry. DeLuca has over 25 years of experience in "brand creation and development, brand management, marketing, and advertising" in the industry. (*Id.* ¶ 1). He credibly testified that companies in this industry "leverage" color to manage and define their brands. Consumers use color to distinguish one brand from others. (Tr. 200). DeLuca testified that while many industries use specific colors as part of their marketing, this is especially true in the wireless-telecommunications industry. (*Id.* ("[T]he wireless category, is probably one of the key categories that absolutely is leveraging color within it to market today.")).

T–Mobile has submitted voluminous exhibits that demonstrate what DeLuca described. T–Mobile and its competitors use specific colors in marketing to identify each company and the products and services offered. The record evidence shows that both T–Mobile and Aio have invested large amounts of money, work, and time developing and implementing marketing

around a particular color. This court finds that within the wireless-telecommunications industry, the major providers use a particular color that is deliberately chosen and developed at great expense as a critical way to distinguish that company's brand, products, and services from competitors and to gain a competitive advantage in marketing those products and services.

## III. The Parties and Their Trademarked Colors

### A. Deutsche Telekom AG and T–Mobile

Deutsche Telekom AG ("DT") is a global telecommunications company that serves over 140 million mobile-telecommunications customers worldwide. (Docket Entry No, 22, Dr. Axel Luetzner Decl. ¶ 4, Ex. 1). In 1990, DT developed the magenta mark to distinguish itself from other telecommunications companies because that color had not been used in the telecommunications industry. (*Id.*, ¶ 5). In the early 1990s, when Deutsche Telekom chose magenta, internal Deutsche Telekom discussions, the German press, and the German public considered the color unusual and bold. (Docket Entry No. 89–34, Tobias Schmidt Reply Decl. ¶ 4). One German press release called T–Mobile magenta "piggy-pink" and stated that "Telekom got this idea because the colour has not yet been used by other companies, hence there is no danger of confusion." (Docket Entry No. 105, Evidentiary Hearing Ex. 7 (German article with English translation)). Deutsche Telekom has spent billions of dollars developing and using the color mark. (Luetzner Decl. ¶ 6).

T–Mobile USA, Inc. ("TM–USA") is an affiliate of Deutsche Telekom. In 2002, TM–USA began selling telecommunications products and services in the United

States under the T–Mobile name, using Pantone Process Magenta as an important part of its marketing. (DeLuca Decl. ¶ 6). In 2007, T–Mobile registered the magenta mark on the Supplemental Register and has registered later iterations incorporating the mark with other elements to identify its telecommunications services. (Docket Entry No. 20, Decl. of Stitt, ¶¶ 2–3, Exs. 1–2). On July 10, 2007, Deutsche Telekom registered on the Supplemental Register "the color magenta alone," which was described as the "approximate equivalent of Pantone Matching System, Rhodamine Red U, as applied to a portion of the packaging for the goods," (id., Ex. 1, Reg. No. 3,263,624), and as "used on the background of product displays and advertisements found in a store," (id., Reg. No. 3,263,635).

At the evidentiary hearing, Aio argued that if T–Mobile had a valid mark in any color, it applied only to Rhodamine Red U, not Pantone Process Magenta. There are at least three problems with this argument. First, the supplemental registration itself identifies the "color magenta alone" and describes it as the "approximate equivalent" to Rhodamine Red U. The Pantone system, as the language in the registration reflects and as confirmed by other courts, serves as an approximation for registration, not a limit on use. Second, DeLuca credibly testified that before the hearing, he was unaware of the registration statements that describe magenta as Rhodamine Red U. He testified that T–Mobile magenta is based on Pantone Process Magenta, and that T–Mobile only used Pantone Process Magenta. (Tr. 226, 251–52). Third, Tobias Schmidt, the Vice President of Brand Management for Deutsche Telekom, credibly testified that the magenta mark may have different labels but that the company has consistently used Pantone Process Magenta as its

brand's color, (Docket Entry No. 89–34 ¶¶ 9–10).

This court finds and concludes that the Supplemental Register's reference to Rhodamine Red U does not limit the mark protections T–Mobile seeks. Additionally, the court finds and concludes that T–Mobile has used Pantone Process Magenta in developing its visual-brand identity in the United States.

From 2002 to the present, T–Mobile has used the magenta mark prominently in every major advertising campaign. (DeLuca Decl. ¶ 6). T–Mobile uses a wide range of paid advertising across a wide variety of media to reach consumers, targeting those between 18 and 49 years old. (DeLuca Decl. ¶ 8). As of November 2013, at the time of the preliminary-injunction hearing, T–Mobile had spent approximately $500 million in advertising in 2013. (Tr. 203). In 2012, T–Mobile spent approximately $688 million. (Tr. 204). Since its 2002 United States launch, T–Mobile has spent approximately $4 billion in advertising. (Id.). The vast majority of the advertising prominently featured the magenta mark. (Id.).

In 2013, T–Mobile served approximately 43 million customers. It has sold over $ 130 billion in telecommunication services and goods in the United States since 2006, with $19 billion in sales in 2012 alone. (DeLuca Decl. ¶ 27).

T–Mobile advertises on television, changing its commercials as its products and services change and with the seasons. (Id., ¶¶ 26–27). The internet is heavily used, from banners on webpages like Google, AOL, Yahoo!, and CNET, to social media such as Twitter and Facebook. In 2013, T–Mobile had 223,576 followers on Twitter, 4.1 million "likes" on Facebook, and an average of 14 million unique monthly visitors to its webpage. (Id., ¶ 7). T–Mobile uses digital video, such as YouTube

and Hulu, to advertise on various devices. T–Mobile advertises in newspapers, magazines, and other printed and on-line publications. T–Mobile also makes heavy use of outdoor billboards and indoor billboard-like signs and displays. T–Mobile advertisements appear on public transportation, such as the sides of buses and on taxicabs. (Tr. 197). In the vast majority of its marketing, T–Mobile prominently features large blocks or swaths of its trademarked bright-pink magenta, (*Id.*).

T–Mobile has even extended its use of the magenta color to radio advertising. A radio advertisement played on the Saturday before "black" Friday—the heavy shopping day after Thanksgiving—promoted "Magenta Saturday." (Tr. 204).

The record evidence details T–Mobile's long, extensive, and consistent use of Pantone Process Magenta in its United States advertising since 2002. In 2003, a well-known actress was featured in an advertisement with the magenta mark. (DeLuca Decl. ¶ 12, Ex. 4). In 2004, T–Mobile used the color magenta to advertise the nationwide expansion of T–Mobile "Hot Spots" and the "Family Talk Free" wireless plan. (*Id.*, ¶ 13, Exs. 5, 6). In 2005, magenta was used prominently in T–Mobile's · "Whenever Minutes" campaign. (*Id.*, ¶ 14, Exs. 7, 8). In 2006, the "myFaves" campaign used magenta in nationwide television and print advertisements. (*Id.*, ¶ 15, Ex. 9). In 2008, T–Mobile launched the "myFaves Family Plan" campaign, followed by a campaign to promote T–Mobile's first "Google" phone the following year. (*Id.*, ¶ 16, Exs. 10, 11). In 2010, T–Mobile launched nationwide campaigns to promote "America's Largest 4G Network" and "Step Up to 4G" expanded wireless coverage. (*Id.*, ¶ 17, Exs. 12, 13). All these campaigns prominently featured large blocks or swaths of the trademarked magenta color.

DeLuca testified about specific T–Mobile advertising campaigns beginning in 2010. When T–Mobile was ready to launch nationwide coverage on the 4G network, it developed a new advertising campaign centering on a character named Carly. Each of this character's two versions wore magenta clothing. (Tr. 213). Carly 1.0 wore a magenta dress; Carly 2.0 wore a black and magenta leather bike suit and drove a black and magenta motorcycle. (Tr. 214). At the evidentiary hearing, T–Mobile played several "Carly" commercials prominently featuring large blocks of Pantone Process Magenta.

During the 2011 holiday season, T–Mobile ran an ad featuring more than 100 women wearing magenta and another commercial featuring a magenta-decorated "Santa's Workshop" complete with elves dressed in silver and magenta, wrapping presents with magenta bows. (DeLuca Decl. ¶ 18, Exs. 14, 15; www.youtube.com/watch?v=3YxEZotxIqg, www.youtube.com/watch?v=AWO-L5soj4s). In 2012, T–Mobile's advertisements included a fall campaign that asked consumers to "Vote Magenta" and a holiday campaign featuring four stockings, each a different color, representing four different wireless carriers. T–Mobile was represented by the Pantone Process Magenta-colored stocking. (*Id.*, ¶ 19, Exs. 16, 17).

The 2013 advertising was similar. In early 2013, T–Mobile began an advertising campaign identifying itself as the "Un–Carrier" to promote its elimination of two-year service contracts. (*Id.*, ¶ 9, Ex. 1), These advertisements consist of the T–Mobile logo and slogans on a magenta background. (*Id.*). T–Mobile also launched the "Jump!" campaign, promoting a program permitting consumers to upgrade their phones twice a year. (*Id.*, ¶ 10). Magenta was used prominently in these advertisements. (*Id.*, Ex. 2). The

heavily magenta "Carly" advertising campaign continued through 2013. (*Id.* ¶ 11).

T–Mobile's marketing includes company-sponsored activities and events. The 2011 National Basketball Association All–Star game is a good example. The arena was changed to replace the "red carpet" with a Pantone Process Magenta carpet, clearly and prominently visible in the televised game. (DeLuca Decl. ¶ 21, Ex. 19). T–Mobile recently announced a Major League Baseball sponsorship. An article describing this sponsorship was titled "T–Mobile gives MLB a magenta makeover with multiyear partnership" and stated that "the magenta carrier will provide an on-field communications system that links team managers in the dugout to coaches in the bullpen." (*Id.*, Ex. 20). In 2013, T–Mobile sponsored a Shakira concert in Manhattan's Bryant Park. (Tr. 221). T–Mobile "created [a] magenta spectacle where [it] uplit the entire park in magenta as well as erecting 40 foot screens that also contain[ed] magenta messaging at the park that night." (*Id.*). The effect was to make midtown Manhattan appear awash in magenta. T–Mobile spent several million dollars on this event, a significant part on the lighting display. (*Id.*).

Over 90% of T–Mobile products and services are purchased in brick-and-mortar stores, including retail outlets such as Wal–Mart and Target. (Tr. 212). Large blocks or swaths of Pantone Process Magenta predominate the T–Mobile stores' appearance. Blocks of monochromatic magenta are frequently used in large signs and displays. The stores use Pantone Process Magenta on signs, displays, and lighting. In addition, magenta is in virtually every visual display at least as a prominent accent. The T–Mobile stores brim magenta.

T–Mobile uses monochromatic blocks of magenta in many promotional materials, ranging from clothing to drink containers to mouse pads. While T–Mobile also uses other colors and other distinguishing marks in its advertisements and materials, these other colors and marks are usually in combination with a predominant presence of Pantone Process Magenta on the advertisement, website, commercial, sign, or other marketing display. In short, other colors or marks generally appear in addition to Pantone Process Magenta, not instead of it or more prominently than it.[4]

The recognition T–Mobile's use of Pantone Process Magenta has achieved as a brand identifier is exemplified in news commentary about the T–Mobile color trademark. An article · from colormaters.com stated that:

> T–Mobile's magenta (hot pink) is an unexpected color in the crowded cellular communications marketplace. Risky but it does succeed in creating a unique identity of the brands.

(DeLuca Decl. ¶ 28, Ex. 28). The *New York Times* and *Bloomberg* have also run articles discussing the T–Mobile magenta mark. (*Id.*, ¶ 22, Ex. 22, 23). The *Bloomberg* article, titled "T–Mobile Helps Customers Fall Into Savings," discusses a September 2012 sale on T–Mobile products and services by referring to the " 'Magenta Deal Days' Zero Down promotion.' " (*Id.*, Ex. 23). A November 2011 *New York Times* article, titled "For Some Marketers, Brand Investment Beats Black Friday," noted that "T–Mobile USA declared last Saturday to be 'Magenta Saturday,' offer-

---

4. Aio correctly points out that, when used on certain surfaces or media, T–Mobile's use of Pantone Process Magenta varies in shade. The court addresses Aio's specific contentions regarding the various shades of magenta that T–Mobile uses in the conclusions of law below.

ing sales on smartphones and tablets. The campaign replaced 'black' with the T–Mobile brand color, magenta." (*Id.*, Ex. 22). Prominent media outlets have recognized magenta as an important and distinctive part of the T–Mobile brand.

The court finds that T–Mobile has prominently displayed and leveraged the magenta mark in extensive and expensive advertising campaigns, marketing, and store appearance since the American launch in 2002. T–Mobile has consistently and effectively used the magenta mark as a brand identifier for a nationwide audience of consumers and potential consumers. For more than 10 years, T–Mobile has successfully invested large sums of money and effort to make Pantone Process Magenta a widely and quickly recognized source identifier for the products and services the company markets in the United States.

## B. Say Hello to Aio

In 2013, T–Mobile announced that it would start offering wireless cellular telephone and other telecommunications services without annual contracts to attract "budget-conscious consumers." (Tr. 105; DeLuca Decl. ¶ 9). The decision to provide such services was a decision to compete against AT & T in a "new and unconventional way." (Tr. 105). In May 2013, AT & T entered the market to compete with T–Mobile for customers who wanted to access to such services. (DeLuca Decl. ¶¶ 34, 35, Exs. 38–40). On May 9, 2013, the Associated Press remarked AT & T had followed "T–Mobile's decision in March to move away from contract-based plans to appeal to more consumers." (*Id.*, Ex. 39). With this new approach, T–Mobile and AT & T customers can change service providers frequently and can do so without purchasing a new cell phone or other device.

AT & T created Aio to provide consumers with wireless cellular services without long-term service contracts. Aio was created as a "flanker" brand because AT & T did not want to "cannibalize" its own customers. AT & T wanted to use Aio to attract and capture consumers who were not currently contracting with AT & T.

Like the existing major telecommunications carriers, AT & T picked a color to brand Aio before launching its marketing campaign. After extensive review and study, including using focus groups and comparing the colors other carriers—including T–Mobile—used, AT & T selected the plum color formally identified as Pantone 676C. AT & T used the company Interbrand, which "creat[es] and manag[es] brand value," to explore and develop Aio's brand identity and visual personality. This work was done under the name "Project Zig."

[redacted]

[redacted]

[redacted]

[redacted]Interbrand prepared an October 2012 "Presentation to the Executive Officers." (*Id.*, Ex. 12). That presentation recognized that all "primary and secondary colors (red, yellow, blue, green, orange) except violet are owned in the prepaid/wireless space." Interbrand suggested using a color pallette that included Aio plum along-side gold (Pantone 110), turquoise (Pantone 7709), white, and black.

Aio went with that color pallette. Internal Interbrand emails summarizing the response to various branding concepts noted concerns that some of the colors suggested were either too close to competitors' color marks or too close to AT & T's own signature orange color. A September 6, 2012, internal Interbrand email indicated that AT & T thought "orange [wa]s too close to home, **love[d] the turquoise,** like

green but can't look like Cricket." (Docket Entry No. 74–23 (bold in original)). An email sent from [redacted] to [redacted] on September 25, 2012, stated that AT & T executives were "struggling a bit with the color," thinking "it's too pink." (Docket Entry No. 74–20). That concern was circulated through Interbrand the next day in an email that stated [redacted] ("struggling with the color as she thinks it's too pink." (Docket Entry No. 74–21)). Almost a month later, in October 2012, AT & T still had a concern about the color. In an email to [redacted] stated that the color problem had nothing to do with "the COLOR itself but its similarity to Verizon and T–Mo." (Docket Entry No. 74–22). [Redacted] "asked that we do a deeper comparison with our pallette (specifically the plum being the problem) against Vz and TMo." (*Id.*). [Redacted] had sent an email to [redacted] which stated "Went well with [redacted] and [redacted] this am. They are concerned about the plum color … Worried that it may be too close to TMO and VZ. I need you to pull some actual executions for VZ and TMO and compare that to our plan. I think we will be fine, we just need *to* show the difference." (*Id.*). AT & T and its brand-development company had significant concerns that the chosen plum color was confusingly similar to T–Mobile magenta.

E-mail exchanges between AT & T corporate executives also demonstrate a conscious effort to go after T–Mobile customers while recognizing that the brand color they chose might be confusingly close to T–Mobile's. For example, on August 29, 2013, [redacted] sent an email to [redacted] The email's subject line was "Aio Opportunity Overview." That email stated that "[w]ith all the attention we are getting from TMO, we've seen a significant increase in online traffic [and] are gearing up to take advantage of our new found opportunity—Leaning in on this one."

That email also described preparing "to go after TM[obile] customers as they are checking us out online—we are working on some creative options and vetting them with the lawyers this afternoon." [redacted] forwarded that email to who [redacted] stated that it "Looks good. Go with it." (Docket Entry No. 74–19).

Focus-group testing that AT & T conducted verified that the plum color was indeed too close to T–Mobile magenta and some of the respondents expressly stated as much. AT & T used a company called LatinWorks for focus-group testing commercials. LatinWorks's notes from the Houston focus group reflected that group members were confused between Aio's color and T–Mobile's color. The comments included a statement about the "pink" in the commercial and a statement about the "pink vibe at beginning." This reviewer thought "[I]t was [T-]mobile. Later realized it was a different company." (*Id.*, Ex. 15, 323). The reviewer found that the "pink color was strong, reminded him of 'Carly'." (*Id.* at 324). The LatinWorks notes emphasized that the reviewer identified the pink color with T–Mobile's Carly character. (*Id.* at 324). In its report on the focus groups, LatinWorks stated that the "plum color sometimes takes [members of the focus group] to T–Mobile at first but then [they] realize its Aio. The women [sic] personality also takes them to T–Mobile as she is wearing somewhat pink dress." (*Id.*, Ex. 16).

The record evidence shows that AT & T recognized T–Mobile's distinctive magenta mark from the outset. AT & T chose a plum color close to T–Mobile magenta. Aio branding executives recognized early on that the plum color was similar to, and evocative of, T–Mobile magenta. The company AT & T hired for focus-group testing and analysis sent a report to AT & T highlighting that because the plum color

was so similar to T–Mobile magenta, focus-group members were initially confused into thinking that the commercials were affiliated with T–Mobile.

Using large swaths or blocks of plum as a prominent part of its marketing campaign, Aio asks consumers to "Say goodbye to T–Mobile, Say hello to Aio." Large monochromatic blocks of plum, similar to T–Mobile not only in shade but also in the use of large monochromatic blocks of a distinctive and vivid color, have been the prominent feature of Aio's coverage maps, signs and displays in retail stores, print advertising, billboard advertising, webpages, social media, and television commercials. Aio, like T–Mobile, brims with broad swaths of bold, bright dark reddish-purple-pink that leaves a vivid impression. The result is to make Aio's use of broad swaths of monochromatic Pantone 676C confusingly similar to T–Mobile's use of broad swaths of monochromatic Pantone Process Magenta.

### Analysis of Findings of Fact and Conclusions of Law

## IV. The Legal Standards

### A. The Preliminary Injunction Standard

■ A preliminary injunction is an "extraordinary remedy." *Texans for Free Enter. v. Tex. Ethics Comm'n,* 732 F.3d 535, 536 (5th Cir.2013). A court may grant an application for a preliminary injunction "only if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Id.* at 536–37 (quoting *Byrum v. Landreth,* 566 F.3d 442, 445 (5th Cir.2009)).

### B. The Lanham Act Standard

■ A plaintiff establishes Lanham Act liability by showing that the defendant " 'uses in commerce any word, term, name, symbol, or device' " that is " 'likely to cause confusion, or to cause mistake' " about the " 'origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.' " *See Paulsson Geophysical Servs., Inc. v. Sigmar,* 529 F.3d 303, 309 (5th Cir.2008) (quoting 15 U.S.C. § 1125(a)(1)(A)). The analysis proceeds in two steps. The court first considers whether the plaintiff has a "protectable right in the mark" and then whether there is a "likelihood of confusion between the marks." *Id.* (citing *Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.,* 750 F.2d 1295, 1298 (5th Cir.1985)).

■ Before issuing an injunction for trademark infringement, the court must consider whether (1) the claimed mark is eligible for protection, (2) the party seeking protection is the mark's senior user, (3) there is a likelihood of confusion between the plaintiff's mark and the defendant's mark, and (4) this likelihood of confusion will cause the plaintiff irreparable injury for which there is no adequate legal remedy. *See id.* (quoting *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.,* 909 F.2d 839, 844 (5th Cir.1990)). The parties do not contest that T–Mobile is the magenta mark's senior user. Aio vigorously attacks T–Mobile's assertion that the magenta mark is entitled to Lanham Act protection.

## V. T–Mobile's Protectable Magenta Mark

■ While courts, including the Supreme Court, were initially skeptical about whether a single-color mark could qualify for Lanham Act protection, that issue is

now resolved. *See, e.g., Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995); *Christian Louboutin S.A. v. Yves Saint Laurent Amer. Holdings, Inc.*, 696 F.3d 206, 225 (2d Cir.2012); *Bd. of Supervisors for La. State Univ. Agric. and Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir.2008). In *Qualitex*, the Supreme Court explained:

> [O]ver time, customers may come to treat a particular color on a product or its packaging (say a color that in context seems unusual, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand. And, if so, that color would have come to identify and distinguish the goods—*i.e.*, "to indicate" their "source"—much in the way that descriptive words on a product (say, "Trim" on nail clippers or "Car–Freshner" on deodorizer) can come to indicate a product's origin.

*Qualitex*, 514 U.S. at 163, 115 S.Ct. 1300 (internal citations omitted). The Supreme Court could not "find in the basic objectives of trademark law any obvious theoretical objection to the use of color alone as a trademark, where the color has attained 'secondary meaning' and therefore

identifies and distinguishes a particular brand (and thus indicates its 'source')." *Id.* Although "a single color, standing alone, can almost never be inherently distinctive because it does not 'almost automatically tell a customer that [it] refer[s] to a brand,'" *Louboutin*, 696 F.3d at 225 (alterations in original) (quoting *Qualitex*, 514 U.S. at 162–63, 115 S.Ct. 1300), "a color scheme can be protected as a trademark when it has acquired secondary meaning and is non-functional."[5] *Bd. of Supervisors*, 550 F.3d at 475 (citing *Qualitex*, 514 U.S. at 163–64, 115 S.Ct. 1300).

■ In the Fifth Circuit, a color mark is distinctive and protectable if secondary meaning is shown.[6] *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 240 (5th Cir.2010); *accord Louboutin S.A.*, 696 F.3d at 225–26 ("In the case of a single-color mark, therefore, distinctiveness must generally be proved by demonstrating that the mark has acquired secondary meaning."). "'Secondary meaning occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Amazing Spaces*, 608 F.3d at 247 (quoting *Bd. of Supervisors*, 550 F.3d at 476); *see also Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529

**5.** The case law is clear on what constitutes functionality, which precludes trademark protection. *See Christian Louboutin*, 696 F.3d at 218–24. Aio does not raise a functionality defense. *See also Bd. of Supervisors*, 550 F.3d at 488 ("We do not believe that the [Supreme] Court's dictum in *TrafFix* requires us to abandon our long-settled view rejecting recognition of aesthetic functionality." (citing *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001))).

**6.** The Fifth Circuit applies the *Abercrombie* test of distinctiveness to determine the protectability of word marks. The Fifth Circuit, however, has recognized that the Supreme Court noted that the *Abercrombie* test is used

"only in the context of marks consisting of words." *Amazing Spaces*, 608 F.3d at 240 (5th Cir.2010) (citing *Wal–Mart Stores, Inc. v. Samara Bros. Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) ("In the context of word marks, courts have applied the now-classic test originally formulated by Judge Friendly" in *Abercrombie* )). "In *Qualitex*, the [Supreme] Court declined to apply the *Abercrombie* [& *Fitch C. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976) ] test to a mark consisting purely of a shade of color used in a product's trade dress, holding that the mark could constitute a legally protectable mark *only* through a showing of secondary meaning." *Id.* (emphasis added) (citing *Qualitex*, 514 U.S. at 162, 115 S.Ct. 1300).

U.S. 205, 211, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

The question is whether the magenta mark is a *"Qualitex* symbol" that distinguishes the source of T–Mobile's goods and services from other telecommunication carriers' goods and services. *Qualitex,* 514 U.S. at 166, 115 S.Ct. 1300 ("It would seem, then, that color alone, at least sometimes, can meet the basic legal requirements for use as a trademark. It can act as a symbol that distinguishes a firm's goods and identifies their source, without serving any other significant function.").

[7] The Fifth Circuit applies a multifactor test for determining whether secondary meaning has been shown:

(1) length and manner of use of the mark or trade dress,

(2) volume of sales,

(3) amount and manner of advertising,

(4) nature of use of the mark or trade dress in newspapers and magazines,

(5) consumer-survey evidence,

(6) direct consumer testimony, and

(7) the defendant's intent in copying the trade dress.

*Amazing Spaces,* 608 F.3d at 248. (quoting *Pebble Beach Co. v. Tour 18 I Ltd.,* 155 F.3d 526, 541 (5th Cir.1998)). These factors are used in other circuits as well. *See, e.g., Louboutin,* 696 F.3d at 226. ("Factors that are relevant in determining secondary meaning include (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." (internal quotations omitted)). The Fifth Circuit's fourth factor—the use of the mark in newspapers and magazines— is properly understood as referring to the use of the mark in the media generally.

"These factors in combination may show that consumers consider a mark to be an indicator of source even if each factor alone would not prove secondary meaning." *Bd. of Supervisors,* 550 F.3d at 476 (citing *Pebble Beach,* 155 F.3d at 541).

[8] Whether a mark "has acquired secondary meaning [is] a question[ ] of fact." *Amazing Spaces,* 608 F.3d at 235 (citation omitted). "Because the primary element of secondary meaning is a mental association in buyer[s'] minds between the alleged mark and a single source of the product, the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry." *Id.* (quotation omitted); *see also Sunbeam Prods., Inc. v. W. Bend Co.,* 123 F.3d 246, 253 (5th Cir.1997) ("The determination that a feature has acquired secondary meaning is a finding of fact [reviewed] for clear error.").

[9] Considering the totality of the relevant factors, the record amply supports the factual finding that T–Mobile magenta has acquired a secondary meaning within the wireless-telecommunications industry. The first four factors strongly weigh in favor of finding secondary meaning. T–Mobile has been using the magenta mark for over 10 years. During this time, T–Mobile has prominently displayed the magenta mark in virtually every aspect of its public marketing and communications. Advertising campaigns prominently feature the magenta color, with particular emphasis on large swaths of magenta that cause the advertisements to "brim" with the color. In those advertising campaigns, T–Mobile has identified itself by the word "magenta" as well as by using large blocks of the magenta color. Examples include the "Vote Magenta" advertising campaign that ran during the last election, the "Magenta Saturday Sale" campaign, and "Magenta Deal Day" campaigns. T–Mobile uses magenta, particularly large blocks of

magenta, on television, in print advertisements, and outdoor advertisements. T–Mobile has over 70,000 stores, each of which prominently features the magenta color. (DeLuca Decl. ¶ 26). T–Mobile serves 43 million customers nationwide and, in the last 8 years, has sold $130 billion worth of services and goods, (*Id.* at ¶ 26), 90% in stores, including retail outlets, that use magenta, (Tr. 212). Media coverage, including newspapers and other publications have recognized the magenta anchor to T–Mobile's marketing and physical appearance.

The fifth factor, consumer-survey information, also supports finding that T–Mobile's magenta mark has acquired secondary meaning. T–Mobile provided the court with consumer-survey information through the expert report of Susan Schwartz McDonald, Ph.D., president and chief executive officer of National Analysts Worldwide, an 80–person business research and marketing consultancy. Dr. McDonald's academic expertise is in social psychology and communications theory. She has authored texts on marketing research and has published numerous articles on marketing and market-research theory. She has lectured on research methodology and marketing at Princeton University, the University of Pennsylvania, and other academic institutions. She also chaired the Board of CASRO, a U.S. industry trade association representing companies that conduct marketing and opinion research. (Stitt Decl. ¶ 4, Ex. 3).

T–Mobile asked Dr. McDonald to study consumer recognition of the magenta mark and whether it had acquired secondary meaning. Dr. McDonald designed and conducted a nationwide internet survey of consumers, between 16 and 65 years old, who are mobile-phone subscribers and who influence the choice over which mobile-phone service provider they use. The survey was structured as a double-blind experiment. The respondents were presented with a test stimulus—T–Mobile Magenta—and a control stimulus—brown—without any brand-identifying information. Each respondent was asked several questions to gauge whether that individual associated the color with a company that offers wireless phone services and, if so, which company.

The test-stimulus survey had 296 respondents, 150 males and 146 females. When presented with T–Mobile magenta, 61% of the respondents answered "yes" when asked whether they associated the color with any company or companies that offer wireless or mobile phone services or plans. When asked whether they associated the color with only one company or with more than one company, 57% of the respondents answered that they associated the color with only one company, "a net of 55%" after adjusting for the control group.

The respondents were then asked to type in the name of the company that used the color. Forty-nine percent of the respondents accurately named T–Mobile, Two of the three respondents who initially answered that they could not name the company later stated that they remembered commercials featuring people wearing the magenta color. Dr. McDonald concluded that this was a T–Mobile association that warranted bringing the T–Mobile association up to 50%.

The survey included 236 individuals between 16 and 55, close to T–Mobile's target age range of 18 to 49. (*See* DeLuca Decl. ¶ 8). When those respondents were isolated, 56% responded that they associated the Pantone Process Magenta color with T–Mobile. By focusing on the target age range, the survey avoided a problem that courts have identified. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.1980) (finding a consumer

survey deficient because, among other things, it "neglected completely defendants' primary customers young, single, male college students.").

With this information, Dr. McDonald concluded that T–Mobile's use of Pantone Process Magenta had acquired a secondary meaning "among at least 50% of consumers aged 16–65 who both subscribe to mobile service and influence provider brand decisions." When the "focus of the analysis [was] narrowed to exclude consumers above 55 (a group that is outside the primary target audience for T–Mobile advertising and promotion), the level of secondary meaning rises to at least 56%." Dr. McDonald explained that "these figures represent the most conservative definition of secondary meaning, insofar as they reflect not merely a single source attribution, but actually, explicit T–Mobile brand attributions. The ability of nearly all who make a single source attribution to name T–Mobile as the source constitutes compelling evidence of secondary meaning, meeting a proof standard that extends beyond the strictest definition of the concept."

Aio attacks this survey and its results on two grounds: the survey should not have been conducted over the internet; and the control stimulus was flawed. These arguments do not justify disregarding or discounting the survey.

 "In assessing the validity of a survey, [the Fifth Circuit] look[s] to two factors: first, the manner of conducting the survey, including especially the adequacy of the universe; and second, the way in which the participants are questioned." *Scott Fetzer v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir.2004). "In an infringement action, 'the appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services.'"

*Id.* (citing *Amstar*, 615 F.2d at 264). Here, Aio does not take issue with Dr. McDonald's survey universe. Aio does dispute how survey participants were questioned and the color chosen as the control stimulus.

Aio uses the reports of Dr. Berns, an expert on color perception, and Dr. Tarr, an expert in visual perception and cognition, to argue that the survey is flawed because it tested color perception through the internet. Aio argues that color perception cannot be validly tested on a computer screen because color settings may vary by computer and there is no way to know whether T–Mobile Pantone Process Magenta was what survey respondents saw when they answered the survey questions.

Dr. McDonald's survey ended by presenting each respondent with three primary colors: red, green, and blue. The survey then required the respondent to confirm that the colors were red, green, and blue. That provided some assurance that the respondents were seeing the intended color, Pantone Process Magenta, when taking the survey. Even with this check, Aio argues that there may be variations among computers that make it unclear whether respondents were seeing Pantone Process Magenta or another magenta shade. This argument proves too much in one sense; color perception is not identical from person to person. And even if different computers and screens projected different magenta shades, the fact that the respondents consistently associated what they saw with T–Mobile confirms the strength of the association of T–Mobile with magenta. If anything, assuming some variation from screen to screen makes the association of bright pink magenta with T–Mobile even stronger. Using the internet to conduct the survey does not undercut its results.

Aio also attacks the survey's use of brown as an implausible and unattractive control color for the wireless-services industry. Aio argues that brown connotes dependability and solidity rather than technological sophistication. The record does not support the argument that this choice of control color undermines the survey. T–Mobile points out that Boost Mobile uses a similar brown color as its signature source-identifier color. Aio's internal documents reflecting its decision to use plum show that it considered butterscotch and gold, both in the brown color "family." Interbrand specifically considered colors in the brown spectrum as opportunity areas. Aio has not explained why brown is so implausible and unattractive as a control-color choice as to make the survey results unreliable.

■ The court finds that Dr. McDonald's methodology was sound and that her report provides reliable consumer-survey analysis. The report provides direct evidence of secondary meaning. "The only direct evidence probative of secondary meaning is consumer surveys and testimony by individual consumers." *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 43 (1st Cir.2001). The fifth secondary-meaning factor weighs in favor of finding that T–Mobile's magenta mark has acquired secondary meaning in the consumer-wireless-telecommunications market.

These five factors support and lead to the finding and conclusion that T–Mobile has demonstrated a substantial likelihood of success on its claim that its magenta mark has acquired secondary meaning. Aio's arguments about the absence of clear evidence on the last two factors, direct-consumer testimony and intent to copy, do not alter that conclusion.

Aio argues that the following factors weigh against finding secondary meaning:

(1) T–Mobile failed to register its mark in the primary trademark register; (2) T–Mobile has been inconsistent in the shade of magenta it uses in advertisements and promotional material; (3) T–Mobile does not use the magenta color as a stand-alone mark; and (4) T–Mobile's use of magenta is nonexclusive, both inside and outside the wireless-services industry. The court concludes that these arguments, considered both separately and together, do not undermine finding secondary meaning.

### A. Registration on the Supplemental Register

Proof of trademark registration "constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services." *Amazing Spaces*, 608 F.3d at 237 (citing Lanham Act §§ 7(b), 33(a); 15 U.S.C. §§ 1057(b), 1115(a); *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 194 (5th Cir.1998)). T–Mobile registered the magenta mark on the Supplemental Register. Aio argues that such registration establishes the invalidity of the trademark right T–Mobile asserts. (Aio Response Brief at 15–16 (Docket Entry No. 76 at 26–27)). Aio relatedly argues that T–Mobile's failure to object or appeal the placement of the magenta mark in the Supplemental Register concedes that the magenta mark lacks secondary meaning.

■ Neither the Fifth Circuit nor other circuit courts has closely examined the meaning of registration in the Supplemental Register. The case law does provide some guidance. While registration "on the principal register shows that the Commissioner has determined that the mark is distinctive[, r]egistration on the supplemental register means that the Commissioner has determined that the mark is 'capable of distinguishing.'" *Cal.*

*Cooler, Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1454 (9th Cir.1985) (citing 15 U.S.C. § 1091 (1982); *In re Simmons Co.,* 47 C.C.P.A. 963, 278 F.2d 517, 519 (1960)). Registration in the supplemental register requires showing "not whether the mark is already distinctive of the applicant's goods, but whether it is capable of becoming so." *In re Bush Bros. & Co.,* 884 F.2d 569, 570 (Fed.Cir.1989) (citing *Simmons,* 278 F.2d at 519). "Thus a mark that is ineligible for registration on the Principal Register because it is merely descriptive of the goods or services may be registered on the Supplemental Register." *Id.* (internal citations omitted); *see also George & Co. v. Imagination Entm't, Ltd.,* 575 F.3d 383, 391 n. 8 (4th Cir.2009) (citing 15 U.S.C. §§ 1057(b), 1094; *E.T. Browne Drug Co. v. Cococare Prods., Inc.,* 538 F.3d 185, 202 (3d Cir.2008)). "[U]nlike principal registration, supplemental registration is not prima facie evidence of the validity of the registered mark, of ownership of the mark, or of the registrant's exclusive right to use the registered mark in commerce." *George & Co.,* 575 F.3d at 391 n. 8. But "[if] the mark later acquires distinctiveness through use in commerce, the mark becomes eligible for registration on the Principal Register." *Bush Bros. & Co.,* 884 F.2d at 570 (citing 15 U.S.C. § 1052(f) (five years of substantially exclusive and continuous use as a mark may be *prima facie* evidence of secondary meaning)). While supplemental registration does not create a statutory presumption of validity, the mark may still become distinctive and legally protectable through its use in commerce.

▮ While registration on the Principal Register provides prima facie evidence of protectability, Aio has not pointed to, and the court has not found, cases holding that failing to qualify for registration on the Principal Register proves, or provides prima facie proof of, unprotectability. *See Cal. Cooler,* 774 F.2d at 1454 (citing *Clairol, Inc. v. Gillette Co.,* 389 F.2d 264, 269 n. 9 (2d Cir.1968) ("We do not mean to imply that failure to contest a Patent Office determination that a mark is registrable only on the supplemental register is a concession that the mark is not, as used, distinctive of the applicant's goods.")). A "mark need not be registered in order to obtain protection because '[o]wnership of trademarks is established by use, not by registration.' " *Bd. of Supervisors,* 550 F.3d at 475 (quoting *Union Nat'l Bank of Tex.,* 909 F.2d at 842). "The key is whether the mark is 'capable of distinguishing the applicant's goods from those of others.' " *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)).

Aio cites *In re Future Ads LLC,* 103 U.S.P.Q.2d 1571, 1574 (T.T.A.B.2012), as support. In that review of an examining attorney's refusal to register a trademark, the Trademark Trial and Appeal Board noted that it is "well settled as a legal matter that a mark owner's acceptance of registration on the Supplemental Register constitutes an admission that the mark is descriptive *at the time of registration.*" *Id.* (emphasis added) (citing to another TTAB decision). T–Mobile introduced its magenta mark in the United States in 2002 and registered it in the Supplemental Register in 2007. (Docket Entry No. 19, Stitt Decl. ¶¶ 2–3, Exs. 2–3). Now, more than ten years after T–Mobile introduced its magenta mark in commerce and almost six years after its registration in the Supplemental Register—and after T–Mobile spent billions of dollars on marketing that emphasized Pantone Process Magenta as uniquely and ubiquitously associated with the company's wireless telecommunications services—the landscape has surely changed. Aio's argument is not a persuasive basis to discount the evidence showing

secondary meaning or to alter the finding and conclusion that the magenta color has acquired secondary meaning.

## B. Shades of Magenta

Aio argues that T–Mobile uses different shades of magenta in different promotional materials and that the use of different shades invalidates the claim that the magenta mark has acquired a secondary meaning. At the evidentiary hearing, Aio introduced a plastic T–Mobile coffee cup (Ex. 184), a metal water bottle (Ex. 185), a mouse pad (Ex. 186), a t-shirt (Ex. 190), and a lady's sport shirt. The items were all clearly bright pink magenta, but the shades varied. Aio also pointed to internal T–Mobile documents that appeared to describe permissible shade variation or color range in T–Mobile marketing products and materials featuring the magenta color.

At the evidentiary hearing, DeLuca credibly testified that T–Mobile strives for consistency and uniformity in using Pantone Process Magenta in its marketing materials. He also credibly testified that some variation inevitably results from the different materials used in marketing. The color looks different when applied to a metal surface than to cloth or paper. Even with these variations, however, the color remains readily identifiable as a distinctive bold, bright magenta. This testimony is consistent with T–Mobile's internal document outlining the amount of permissible shade variation. The document states that "[m]agenta is used consistently across all media to the extent this is technically feasible. The variances shown above are permitted." (Aio Response Br. at 19). T–Mobile instructs its marketing-materials manufacturers and vendors to use Pantone Process Magenta. Despite efforts to have the identical shade, Pantone Process Magenta, appear every time, in every application, some variations are inevitable. The fact that T–Mobile executives have defined the degree of permissible variance is unsurprising and does not detract from the secondary meaning that T–Mobile magenta has acquired in the marketplace. Aio's argument that T–Mobile not only tolerates, but encourages, the use of color variations is overstated.

Aio argues that T–Mobile's allowance for a range of magenta shades precludes it from asserting protected trademark status, much less secondary meaning, in the color. T–Mobile has registered a specific color that it has been using as a brand identifier since 2002. T–Mobile seeks protection of that color. T–Mobile has produced ample evidence that it has developed a nationally recognized brand through consistent, extensive use of large monochromatic blocks or swaths of its signature bright-pink magenta color in its marketing and store appearance.

The Pantone system is a tool for identifying colors in a way that is clearly understood. *See, e.g., McCarthy* § 7:45.70 ("Some courts have used the Pantone system as a method of defining the limits of trademark protection of a color and giving the defendant an objective benchmark for complying with an injunction. Under this approach, a court could define the scope of a trademark in a color as, for example, ten numbered shades on each side of Pantone color number 165."). Aio is correct that establishing a protectable right in a trademark based on or significantly featuring a color does not entitle the trademark holder to rights in a wide range of shades of that color. But that is not what T–Mobile is doing here, T–Mobile has consistently used the same shade of bright-pink magenta known as Pantone Process Magenta. The record shows modest variations in shades of magenta due to different advertising or promotional materials. The record also

shows the use of variations in magenta shades as well as other colors as additions or accents to large blocks of Pantone Process Magenta. Neither puts T–Mobile in the position of seeking protection for such a wide range of magenta shades that it is entitled to no protection at all. And Aio's argument does not detract from Dr. McDonald's survey report, which provides direct evidence of secondary meaning in T–Mobile pink, Pantone Process Magenta.

Under Aio's theory, T–Mobile would have to reject wholesale any product or merchandise that does not exactly match Pantone Process Magenta and ensure that it does not ever use any shade variation. Otherwise, T–Mobile would lose its ability to claim a protectable right in magenta as part of its trademark. T–Mobile would also have to provide an accounting for its use of Pantone Process Magenta as opposed to any variations of the color over the last ten years. (Aio Brief at 21 ("Because T–Mobile has used so many different shades of pink, and *admittedly* cannot break out its advertising expenditures for each of the many shades of pink it uses, T–Mobile's evidence of advertising spent is entirely unpersuasive." (citations and footnote omitted))). The case law does not support Aio's underlying assumption that once T–Mobile identifies and pursues protection of a particular Pantone color, that color cannot be protected or acquire secondary meaning unless every appearance and use conforms exactly to that color. In *Louboutin,* the Second Circuit noted that the defendant's chief executive officer recognized "the notoriety of the distinctive signature constituted by the red sole of LOUBOUTIN models in contrast with the general presentation of the model, particular its upper, and so for all shades of red," 696 F.3d at 206. The Second Circuit concluded that by "placing the color red 'in [a] context [that] seems unusual,' *Qualitex,* 514 U.S. at 162, 115 S.Ct. 1300, and delib-

erately tying that color to his product, Louboutin has created an identifying mark firmly associated with his brand which, to those in the know, instantly denotes his shoes' source." *Id.* (some quotation marks omitted). Similarly, T–Mobile's use of bright-pink magenta as an identifying color in the wireless-telecommunications industry was unusual. T–Mobile has tied bright-pink magenta to its products and services by investing billions of dollars in a decade-long marketing campaign. The survey evidence shows that consumers associate magenta with one brand in the industry; more than a majority of T–Mobile's target audience associate it with T–Mobile. Aio has not cited persuasive or binding authority that some tolerated color variance precludes secondary meaning. *See also SLB Toys USA, Inc. v. Wham–O Inc., et al.,* CV 06–1382 (RSWL) (C.D.Ca. Dec. 5, 2007) (enjoining "the color yellow on the sliding surface of water slide toys, or packaging or advertising depicting the same, or any mark similar thereto or likely to cause confusion therewith."), *aff'd,* 330 Fed.Appx. 634, 636 (9th Cir.2009) ("The wording need not catalog the entire universe of possible variations of the color yellow as long as its text is sufficiently clear to protect Wham O's interests and to provide SLB with adequate notice. The text here meets that standard.").

### C. The "Stand–Alone" Argument

Aio argues that T–Mobile's magenta cannot have achieved secondary meaning because T–Mobile uses the color only in combination with its word mark or other source-identifying information. Aio reasserts in this context its argument that because T–Mobile marketing uses varying magenta shades, T–Mobile does not have a valid mark in the color.

Aio's argument that T–Mobile magenta cannot have a secondary meaning because

it is used only with other source-identifying information lacks record and legal support. Dr. McDonald's consumer survey did not use source-identification information besides the magenta color. A clear majority of T–Mobile's target consumer group associated magenta alone with T–Mobile. Record evidence also shows that competitors use magenta to represent T–Mobile. T–Mobile's use of magenta was consistent, prominent, and pervasive. Aio's logic proves too much; under it the "T–Mobile" word mark by itself may not be protectable.

The circuit cases Aio relies on are inapposite. In *Amazing Spaces,* there was no survey evidence in the record and the trial and appellate courts considered the star symbol at issue "decorative and ornamental." 608 F.3d at 249. The Fifth Circuit stated that the star symbol was "a minor piece" in the overall trade dress, and the advertising did not prominently feature the star symbol. *Id.* The evidence as to T–Mobile's use of magenta is different. Here, the record is clear that T–Mobile has made magenta a central feature of its trade dress and in its advertising. The record shows that T–Mobile's competitors prominently use magenta to represent T–Mobile in advertising and commercials.

The Third Circuit case Aio cites, *E.T. Browne Drug. Co. v. Cococare Products, Inc.,* 538 F.3d 185 (3d Cir.2008), also provides little analytical support for Aio's position. The Third Circuit reviewed a grant of summary judgment that the phrase "Cocoa Butter Formula" had acquired secondary meaning. The Third Circuit found that the marketing and sales evidence did not support finding secondary meaning because the actual phrase used throughout the marketing was "Palmer's Cocoa Butter Formula." *Id.* at 200. "Nothing in the record would allow a jury to evaluate the strength of the term 'Cocoa Butter For-

mula' independently from the larger term including 'Palmer's.'" *Id.* The court concluded that "under the specific circumstances ... the marketing and sales evidence provided by [plaintiff did] not create a reasonable inference that 'Cocoa Butter Formula' ha[d] acquired a secondary meaning," Again, that is not this case. This case involves a color mark, not a word mark. The plaintiffs here do not seek secondary-meaning status for some, but not all, of the words in the phrase that constituted the mark. And this record includes objective evidence that the magenta color alone acquired secondary meaning, the consumer survey and Dr. McDonald's report. In the *Cocoa Butter* case, the Third Circuit noted the result might have been different if the plaintiff had a secondary-meaning survey. *Id.* at 201 (stating that the plaintiff "could have used survey evidence to show that 'Cocoa Butter Formula' had acquired a secondary meaning in the minds of consumers, thus creating a genuine issue of material fact on the issue"). And, as noted, the record evidence shows that T–Mobile's competitors use a magenta color to represent T–Mobile in marketing materials.

Aio also argues that T–Mobile magenta lacks secondary meaning because it does not "signal consumers to look for 'magenta.'" (Aio Response Br. at 21). Aio concedes that three "look for" ad campaigns are in the record but argues that more is needed. (*Id.* at n. 12 ("T–Mobile points to a grand total of *three* 'look for' ad campaigns directing consumers to the Magenta Mark." (emphasis in original))). Aio points to no Fifth Circuit case requiring "look for" evidence. The cases Aio cites do not support its argument. For example, in *Yankee,* there was no evidence that the plaintiffs "advertis[ed] the *specific* trade dress claimed," and there was a "lack of evidence demonstrating a conscious connection by the public between

the claimed trade dress and the products source." 259 F.3d at 43 (emphasis in original). Extensive advertising using the trade dress was necessary but insufficient circumstantial evidence of secondary meaning. The *Yankee* plaintiffs argued that their use of "look for" advertising was more probative of secondary meaning than regular advertising. The First Circuit rejected the argument. The case does not stand for the proposition that advertising must be "look for" advertising to be probative of secondary meaning. Rather, the court stated that "[a]lthough evidence of the pervasiveness of the trade dress may support the conclusion that a mark has acquired secondary meaning, it cannot stand alone." *Id.* Here, the record includes evidence of consumer association that extends beyond the pervasive use of the trademark. Aio's stand-alone argument is not a persuasive basis for finding T–Mobile's magenta mark invalid, unprotected, or without secondary meaning.

### D. The Exclusivity Argument

 Aio argues that because third parties use magenta both in and out of the wireless-telecommunications industry, T–Mobile cannot demonstrate secondary meaning. The argument is unpersuasive, for several reasons. First, the evidence of secondary meaning belies the assertion that third-party use has defeated or precludes the association between the magenta mark and the T–Mobile brand. The survey evidence showed that even with third-party magenta uses, more than a majority of T–Mobile's target consumers responding to the survey made the association. Second, Aio identifies entities that use magenta for marketing in and out of the telecommunications industry, but there is no evidence about the strength of any association between those color uses and the products or services being advertised. Though "[c]ommon use within an industry

weakens the ability of the [trade dress] to indicate a particular source," such use does not preclude that ability. *See Berg v. Symons,* 393 F.Supp.2d 525, 555–56 (S.D.Tex.2005) (Rosenthal, J.).

Additionally, the record shows that T–Mobile's use of magenta as a brand identifier was in fact uncommon. Identifying other uses of magenta in marketing is not prima facie evidence that those uses have affected how the public views magenta in the wireless-telecommunications industry. The court has not been provided with information about the extent and effect of the purported third-party use. Aio's argument does not undermine this court's findings of fact and conclusions of law on secondary meaning. *See, e.g., Palm Bay Imps. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 1373 (Fed.Cir.2005) ("[W]here the 'record includes no evidence about the *extent of [third party] uses* ... [t]he probative value of this evidence is minimal.'" (emphasis and alterations in original (quoting *Han Beauty, Inc. v. Alberto–Culver Co.,* 236 F.3d 1333, 1338 (Fed.Cir.2001)))); *Abraham v. Alpha Chi Omega,* 781 F.Supp.2d 396, 417 (N.D.Tex.2011) ("'[A] trademark owner's failure to pursue potential infringers does not in and of itself establish that the mark has lost its significance as an indicator of origin.'" (quoting *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1080 (5th Cir.1997))).

### VI. The Likelihood of Confusion

 Aio disputes whether its plum color is likely to cause confusion with T–Mobile's magenta. "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Elvis Presley Enters.,* 141 F.3d at 193.

A finding of likelihood of confusion is a finding of fact. *Paulsson*, 529 F.3d at 306 ("In reviewing a trademark claim, a 'finding of a likelihood of confusion is ... a finding of fact reviewed for clear error.'" (quoting *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 665 (5th Cir.2000))). The court must consider eight digits of confusion:

(1) the strength of the plaintiff's mark;

(2) the similarity of design between the two marks;

(3) the similarity of the products or services;

(4) the identity of the retail outlets and purchasers;

(5) the similarity of the advertising media used;

(6) the defendant's intent;

(7) the evidence of actual confusion; and

(8) the degree of care exercised by potential purchasers.

*See Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir.2008); *Elvis Presley Enters.*, 141 F.3d at 194. "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these digits of confusion." *Elvis Presley Enters.*, 141 F.3d at 194, "In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists." *Id.*

As explained in detail below, digits 1, 3, 4, and 5 weigh heavily in favor of finding a likelihood of confusion. T–Mobile's mark is strong for the same reasons it has acquired secondary meaning, T–Mobile and Aio offer very similar products and services and sell them through very similar retail outlets. Both companies target consumers seeking low-cost contract-free wireless services. Both companies use the same type of media to advertise their products and services. The evidence of actual confusion weighs slightly in favor of T–Mobile. Additionally, the court finds that the wireless-telecommunication industry's focus on color as integral to brand identification and the fact that all major competitors pick and use colors in a similar fashion relevant to the analysis. The likelihood of confusion analysis turns on the similarity between the two marks.

### A. The Type of Trademark Infringed

This first factor turns on a trademark's strength. "The strength of a trademark in the marketplace is measured by its effectiveness in identifying a source of goods." *Quantum Fitness Corp. v. Quantum Lifestyles Ctrs., L.L.C.*, 83 F.Supp.2d 810, 818–19 (Rosenthal, I) (citing *Sunbeam Prods.*, 123 F.3d at 252 ("The gravamen of trademark law is source identification.")). "In looking at the strength of the mark, the focus is the senior user's mark." *Elvis Presley Enters.*, 141 F.3d at 201. "The stronger the mark, the more likely it is that encroachment on it will produce confusion." *Champions Golf Club, Inc. v. The Champions Golf Club*, 78 F.3d 1111, 1117 (6th Cir. 1996). "Marks may be strengthened [in the marketplace] by extensive advertising, length of time in business, public recognition, and uniqueness." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir.1988).

"Another factor in determining the strength of a mark in the marketplace is the extent of third-party usage of similar marks." *Quantum*, 83 F.Supp.2d at 820 (citations omitted). "'The greater the number of identical or more or less similar trade-marks already in use on different kinds of goods, the less is the likelihood of confusion.'" *Id.* (quoting *Amstar*, 615 F.2d at 259–60). "The logic behind this

rule is that 'customers [may] have become so conditioned by a plethora of such similar marks that customers have become educated to distinguish between different [such] marks on the basis of minute distinctions.'" *Id.* (quoting 2 *McCarthy* § 11:88, at 11–149 (internal quotation marks and citation omitted)).

■■■■ The "Fifth Circuit considers evidence of third-party usage of a mark on *unrelated* goods and services in assessing the mark's strength in the marketplace." *Id.* (emphasis in original) (citations omitted). Third-party use outside the mark's marketplace may be permissible because it is outside the protection the mark provides. *See id.* For example, while Domino Sugar may prevent other sugar companies from using the wordmark "Domino" to sell sugar products, using the phrase "Domino's Pizza" to sell pizza is not an infringement. *See id.* at 821 (discussing *Amstar,* 615 F.2d at 259). "[T]hird-party usage may limit the scope of protection for a mark when the mark is used for purposes outside the uses to which plaintiff has already put the mark." *Id.* at 820 (quotation omitted).

Aio challenges the strength of T–Mobile's magenta mark for the same reasons Aio argued that the mark lacked secondary meaning: "[i]t is undefined, is used inconsistently, is never used without other source designators, is not called out in ads, and is not exclusive." (Aio Response Br. at 27). T–Mobile responds with the same arguments it made to show secondary meaning. Based on the direct evidence from the consumer survey, the billions spent on the pervasive and effective use of

T–Mobile magenta on a wide variety of advertising beginning in 2002, and the other record evidence and findings set out above that indicate the mark's uniqueness and that newspapers and competitors use magenta to represent T–Mobile, the court finds that the magenta mark is strong.[7]

The court finds that T–Mobile's magenta mark is strong and that the first digit of confusion weighs heavily in T–Mobile's favor.

### B. The Similarity of Products and Services

■■■■ "The greater the similarity between products and services, the greater the likelihood of confusion." *Elvis Presley Enters.,* 141 F.3d at 202. T–Mobile and Aio offer very similar products and services. Aio directly competes with T–Mobile. Aio advertisements in the record ask consumers to "say goodbye to T–Mobile" and to "say hello to Aio" to obtain the same type of wireless telecommunication products and services. Aio concedes that it and T–Mobile target "similar markets" and that both compete in the "no-annual-contract market." (Aio Response Br. at 29).

The court finds that Aio and T–Mobile offer very similar products and services. This digit of confusion weighs heavily in T–Mobile's favor.

### C. The Identity of Retail Outlets and Purchasers and Degree of Care

■■■■ "Differences in the parties' customer bases can lessen the likelihood of

---

7. In assessing a mark's strength in analyzing both secondary meaning and likelihood of confusion, the Fifth Circuit usually applies the *Abercrombie* test of distinctiveness. *See, e.g., Am. Rice,* 518 F.3d at 330 ("[T]he strength of the mark, and of its protection, increases as one moves away from generic and descriptive

marks toward arbitrary marks." (quotation omitted)). As the Fifth Circuit explained in *Amazing Spaces,* the range of distinctiveness articulated in *Abercrombie* is inapplicable to marks "consisting purely of a shade of color used in a product's trade dress." 608 F.3d at 240.

confusion." *Quantum,* 83 F.Supp.2d at 826 (citing *Exxon,* 628 F.2d at 505–06; *Amstar,* 615 F.2d at 262; *CICCorp., Inc. v. AIMTech Corp.,* 32 F.Supp.2d 425, 437 (S.D.Tex.1998)). Aio and T–Mobile target budget-conscious customers by offering services without long-term service contracts. Aio concedes that it and T–Mobile "target similar markets." (Aio Response Br. at 29). "The group of consumers seeking to purchase" from T–Mobile "would overlap almost completely with the group of consumers seeking to purchase" from Aio; "this similarity would indicate confusion under the fourth digit." *Scott Fetzer,* 381 F.3d at 485 (citation omitted). The fourth digit of confusion weighs heavily in favor of T–Mobile.

Aio argues that having the same customer base does not weigh in T–Mobile's favor because the products and services at issue—cell phones—are "high-involvement" goods that cause consumers to exercise a "high degree" of care. Aio's argument attempts to use the eighth digit of confusion, degree of care exercised by purchasers, to neutralize the effect of the fourth digit of confusion.

The Fifth Circuit considers "the degree of care exercised by purchasers: confusion is more likely, for example, if the products in question are 'impulse' items or are inexpensive." *Sno–Wizard Mfg., Inc. v. Eisemann Prods. Co.,* 791 F.2d 423, 428 (5th Cir.1986) (citing *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.,* 725 F.2d 336, 345 (5th Cir.1984)). Aio relies primarily on the expert report of Dr. Joachimsthaler to support its claim that consumers exercise such a high degree of care in buying cell phones and service plans as to preclude finding a likelihood of confusion between Aio and T–Mobile caused by the similarity between the plum and magenta each uses. (Docket Entry No. 77–4, Dr. Joachimsthaler Rpt.).

Dr. Joachimsthaler is the founder and Chief Executive Officer of Vivaldi Partners Group, a strategic consulting firm focused on marketing. He has a doctorate in business administration, with an emphasis on statistics and marketing. He has held faculty positions in graduate business schools in universities in this country and in European institutions. He has published journal articles and books, including *Brand Leadership: The Next Level of the Brand Revolution* and *Hidden in Plain Sight: How to Find and Execute Your Next Growth Strategy.*

Dr. Joachimsthaler opined that "wireless services are rarely if ever spontaneous purchases" and that consumers exercise "tremendous search and cognitive effort to understand the advantages and disadvantages of various offerings across the market and even across the offerings of one particular brand." (Joachimsthaler Rpt. ¶¶ 14, 17, 22). In "buying mobile phones or committing to mobile service plans," consumers "gather and process significant amounts of information, and the relative weight of color on consumer-decision making process decreases." (*Id.* ¶ 40). Color, he concludes, plays a reduced role in the purchase decision than it might for other kinds of goods and services. (*Id.* ¶ 42). As a result, color "does not trigger the actual need for wireless services, nor does it provide information to consumers during the extensive high involvement consideration and evaluation stages. Consumers factor in a multitude of advantages, disadvantages, benefits, and risks to arrive at a purchase decision and select one wireless carrier. Color, however, is not one of them." (*Id.*).

This argument fails to take into account or respond to some key elements of T–Mobile's likelihood-of-confusion claim. First, the argument treats decisions to purchase the Aio and T–Mobile wireless

products and services at issue as similar to decisions to make purchases requiring significant expense or long-term commitment. The point about these relatively new products and services is that they do not require the consumer to commit to a long-term contract, as similar purchases did before the recent innovations. At the evidentiary hearing, T–Mobile highlighted the fact that consumers can bring in their own cell phones and transfer carriers, purchasing service one month at a time for $35, $45, or $50, which is relatively inexpensive and requires no long-term commitment. (Tr. 434–35). These are not purchases by consumers who "are buying for professional and institutional purposes at a cost in the thousands of dollars, [and who] are virtually certain to be informed, deliberative buyers." *Oreck Corp. v. U.S. Floor Systems, Inc.,* 803 F.2d 166, 173 (5th Cir. 1986) (citations omitted). While purchasing a smartphone or a two-year service contract may be a "big ticket" item, that is only one aspect of the products or services at issue and not the innovative aspect over which T–Mobile and Aio are focusing their competition. The new services are relatively low cost and short term. This reduces the significance of the consumer-care digit of confusion under Fifth Circuit case law and the reliability of Dr. Joachimsthaler's opinion.

T–Mobile submitted Dr. Dhruv Grewal's report to respond to Dr. Joachimsthaler. (Docket Entry No. 89–36, Dr. Grewal Rpt.). Dr. Grewal pointed out that Dr. Joachimsthaler failed to consider the market for no-contract wireless services, "His conclusions are based on secondary data from the broader wireless industry. These materials are inappropriate to use for analysis of consumer behavior in this case [because] the relevant market [is] 'no contract wireless communication services.'" (Grewal ¶ 31). Dr. Joachimsthaler responded that the assertion was purely speculative. (Docket Entry No. 98, Joachimsthaler Rebuttal, ¶ 38). But Dr. Joachimsthaler defined high-involvement purchases as ones that consist of "considerable importance to consumers, associated with high financial or social risk, and where consumers are willing to invest significant time and resources to evaluate alternatives and align their choice to their preferences and needs." (Joachimsthaler ¶ 17). He also described the selection of a wireless carrier as "relatively infrequently occurring event [that] involves a significant financial commitment of easily several hundred dollars per year on the part of consumers." (*Id.* ¶ 21). These descriptions fail to account for the reduced price and short-term nature of the service contracts both T–Mobile and Aio offer. The purchase decisions at issue are similar in this respect to those involving lower-cost consumer items. Such purchases do lend themselves more to impulse considerations.

As discussed more fully below, the case law recognizes as a general matter that the lower the product or service cost and commitment, the greater the likelihood of initial-interest confusion may be. Dr. Joachimsthaler also argued in rebuttal that other factors make the wireless-provider decision high involvement. (Joachimsthaler Rebuttal Rpt. ¶ 28 (complicated options motivate research); ¶ 30 (transactional switching costs); ¶ 37 (consumers buy devices when switching plans)). Assuming that Dr. Joachimsthaler's characterization of the amount of research and care that consumers bring to the purchase decisions is accurate, that does not respond to T–Mobile's point about the importance of initial brand identification and resulting consumer interest.

Assume, as Dr. Joachimsthaler's report states, that a consumer researches and considers the advantages of products and

services "across the market" or across a particular brand, such as researching and comparing an Iphone to an Android or one service plan to another. T–Mobile is not arguing that the identification between it and magenta causes a consumer to buy an IPhone instead of an Android phone or to pick a two-year contract rather than service without a long-term contract. Instead, T–Mobile asserts that Aio's plum is so similar to T–Mobile's magenta that a consumer is likely to look at Aio in the first place on the mistaken assumption that it is affiliated with T–Mobile. Such a consumer would bring this mistaken assumption to any research or comparison efforts. Aio will benefit from the consumer's belief that Aio is affiliated with T–Mobile and will impute to Aio the goodwill that T–Mobile has expensively and carefully built since 2002. "[W]hen a consumer sees Aio's (a new brand) TV spot, the brands similarity to T–Mobile is likely to enhance their willingness to view it, as they feel comfortable, by implicitly or explicitly ... making an association with T–Mobile." (Grewal Rpt. ¶ 26). Neither Dr. Joachimsthaler's report nor Aio's arguments and other submissions credibly or persuasively respond to T–Mobile's initial-interest confusion evidence and argument.

▮▮▮ "Trademark infringement occurs only when the use sought to be enjoined is likely to confuse purchasers with respect to such things as the product's source, its endorsement by the plaintiff, or its connection with the plaintiff." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388(5th Cir.1977) (citations omitted). "Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed

as a result of the confusion." *Elvis Presley Enters.*, 141 F.3d at 204 (quotations omitted). Initial-interest confusion "gives the junior user credibility during the early stages of a transaction and can possibly bar the senior user from consideration by the consumer once the confusion is dissipated." *Id.* (citation omitted).

Dr. Joachimsthaler's report does not persuasively speak to the affiliation-confusion claim as it relates to either initial-interest or continued confusion. Though a consumer might research and think about what phone to buy or what service to get, there is no evidence that this would reveal that Aio is not a T–Mobile affiliate and is actually an AT & T subsidiary. To the contrary, Aio's predominant display of the large swaths of the plum color at every stage that the consumer is likely to encounter—from webpages to billboards to television ads to store signage and displays—supports the likelihood of initial-interest confusion with no readily available clarifying information.

Dr. Joachimsthaler asserts confusion is "very unlikely" because of the variance between the products and services the two carriers offer.[8] But this assertion does not appear to account for the very consumers Aio and T–Mobile are striving to attract: consumers looking for the same type of products and services. Such consumers want inexpensive cell-phone service and a no-contract carrier. Initial-interest confusion and beyond could well result if such consumers, seeing Aio advertisements or displays awash in what looks like T–Mobile magenta, and seeing the similarity of the services and products Aio and T–Mobile offer, believes Aio to be affiliated with T–Mobile. The fact that AT & T was concerned about picking a color too close to its

---

8. The basis for this is unclear at best. For example, major carriers now offer I–Phones and 4G LTE coverage.

signature orange color because that might result in the "cannibalization" of its own customers tacitly concedes the point.

At the evidentiary hearing, counsel for Aio properly acknowledged that color is "valuable to consumers because [it] decreases search costs.... Valuable to owners [of the mark] as [it] represent[s] good will.... Good will that [the mark holder] is protecting .... over time, we expect [consumers] to develop some connection to us. We hope that they will come back to us and recognize our ads and our items overtime." (Tr. 397–98). At the hearing, discussion between the court and Aio's counsel continued:

> The Court: Well, if there was an initial confusion that is, you took someone who had an existing loyalty to T–Mobile and you got them to look at you out of a belief that you were affiliated with or were T–Mobile and then made yourself the focus of attention and research, wouldn't that be an effective way to influence the kind of behavior you want to have occur?
>
> . . .
>
> And I am just asking you is there anything in the record to show something like that.
>
> Aio: So the answer is there's nothing in the record that says that happened. In theory, it could....

(*Id.*).

There is no evidence in the record of such actual confusion. But such evidence is not required. The record is clear that T–Mobile has spent billions of dollars developing its brand and its identification with the color magenta. Consumers associate magenta with T–Mobile. Additionally, as the court previously found, the record is replete with examples of T–Mobile and other wireless companies using color to identify the major wireless companies. When asked why a company would spend

millions (as in the case of Aio) or billions (as in the case of T–Mobile) to develop and use colors in advertisements to differentiate brands if it would have no effect on consumers' decisions, Aio did not provide a sufficient answer.

As noted, Dr. Joachimsthaler emphasizes the research and thought that consumers exercise to choose a wireless-service plan or mobile device to reach the conclusion that there is no likelihood of confusion here. The case law discusses the customer-care digit for purchases of "relatively inexpensive items." *See, e.g., Xtreme Lashes, LLC v. Xtended Beauty, Inc.,* 576 F.3d 221, 231 (5th Cir.2009); *Smack Apparel,* 550 F.3d at 483. Neither Dr. Joachimsthaler nor Aio adequately addresses the analytical effect of no-contract services and the relatively low cost of what T–Mobile and Aio are competing to offer. And the degree of customer care in choosing a product such as a cell phone or a service plan does not negate the fact that T–Mobile and Aio's consumer bases are so similar. As T–Mobile's counsel stated at the evidentiary hearing, "[u]sing a color that is close to that of a market leader can be actually a very shrewd and effective strategy because that reduces the agency cost to consumers. That makes it easier for consumers to draw an association that, 'Hey, this has something to do apparently with a reliable wireless company.' That helps reduce the cost of advertising." (Tr. 433).

The court finds that the fourth digit of confusion weighs in T–Mobile's favor. The eighth-digit of confusion, degree of customer care, does not alter that finding or conclusion.

Dr. Joachimsthaler's report does not adequately address the initial affiliation-confusion argument, color's role in brand identification, the prominent use of color in

advertisements by both T–Mobile, Aio, and their competitors, the money spent in developing brand images in which color is integral and critical, and the relative low-cost and low-commitment aspects of what Aio and T–Mobile sell. The court finds Dr. Joachimsthaler's report insufficient to show that customers are so cautious or careful that they would be unlikely to confuse Aio and T–Mobile, including by initially confusing Aio with a T–Mobile subsidiary or affiliate.

The court finds and concludes that the eighth digit of confusion, degree of customer care, does not weigh in Aio's favor.

### D. Similarity of Advertising Media Used

Aio concedes that it and T–Mobile use similar advertising media. (Aio Response Br. at 30 ("Although the parties advertise in similar channels....")). Aio argues that its advertising message is distinct and that as a result there is no likelihood of confusion. Aio's slogan is "Simply. Delightfully. More." By contrast, T–Mobile's slogan is the "Un-carrier ... unwilling to play by the rules," "unsatisfied with the status quo," and "un-afraid to innovate." Aio argues that because the companies have a different "look and feel," "consumers, considering how they actually perceive and encounter brands in the marketplace, are unlikely to be confused about the source of origin of these two brands." (Aio Response Br. at 31 (quoting Joachimsthaler Report ¶ 79)).

As an initial matter, assuming Aio's argument is correct, this digit of confusion would still weigh heavily in favor of T–Mobile. This particular digit of confusion considers the degree of overlap in the marketing approaches of the plaintiff and the defendant. *See Dallas Cowboys Football Club, Ltd. v. Am. Team Props., Inc.*, 616 F.Supp.2d 622, 639 (N.D.Tex.2009) (quoting *Quantum Fitness*, 83 F.Supp.2d at 827). Here, Aio concedes, and the record evidence confirms, that the marketing channels overlap.

Aio's argument, however, does not respond to T–Mobile's arguments or adequately address the record evidence. T–Mobile does not argue that consumers will ignore the words "Aio" and the slogan it uses. T–Mobile does not argue that consumers will think they are looking at T–Mobile signs and slogans. T–Mobile argues that "the color used by Aio is sufficiently similar to T–Mobile's Magenta Mark that prospective purchasers are likely to believe that Aio and T–Mobile are somehow associated." The Fifth Circuit has stated that while "labels may dispel consumer confusion, under appropriate circumstances," the ultimate determination of confusion is a question of fact for the district court and "mere labeling of a product will not automatically alleviate a likelihood of confusion." *Sunbeam*, 123 F.3d at 259. Having found that the wireless-telecommunications industry heavily relies on color to differentiate the major brands and that consumers in the target group associate the color magenta with T–Mobile, the fact that Aio's "brand personality" has some differences from T–Mobile's does not alleviate the likelihood of confusion caused by its similar uses of a similar color. Aio overstates the difference between the "brand personalities" created by the slogans while understating its similarity between broad monochromatic swaths of the similar shade of magenta both parties use in marketing.

The "brand personalities" Aio describes do not appear to be as durable or as impactful as the visual impact of large swaths or blocks of plum or magenta in identifying the brand and source. For example, the record indicates that T–Mobile changes its brand personality. *Compare* Carley 1.0 (appearing as "the girl

next door" and wearing a demure magenta sundress), *with* Carley 2.0 (the same girl who now rides a motorcycle in a magenta dominated commercial and wearing a magenta-trimmed leather biker suit). The fact that some elements of Aio branding might be different in tone from T–Mobile's does not detract from the affiliation-confusion argument. *See Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir.1989) (noting that a label "fails to address the possibility that individuals might assume that Apples were made by Keds").[9]

The similarity of the advertising media weighs heavily in T–Mobile's favor.

### E. Aio's Intent

The record contains evidence that Aio did not have a bad-faith intent to confuse consumers. Marketing materials suggest at least an initial attempt to pick a part of the color spectrum unoccupied by major industry competitors. But the record also contains evidence that AT & T recognized that Aio plum could be confusingly close to magenta and proceeded nonetheless, including in using broad swaths of plum similar to the broad swaths of magenta T–Mobile uses. This digit of confusion does not weigh in favor of either AT & T or Aio.

### F. Similarity Between Marks

■ The Fifth Circuit uses a "subjective eyeball test" to determine whether two marks are similar. *See Exxon Corp. v. Tex. Motor Exchange of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir.1980). "The use of a mark in advertising; is highly probative of whether the mark creates a likelihood of confusion in relation to another mark." *Elvis Presley Enters.*, 141 F.3d at 197. "Evidence of the context in which a mark is used on labels, packages, or in advertising material directed to the goods is probative of the reaction of prospective purchasers to the mark." *Id.* (citations omitted). "Courts consider marks in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements." *Id.* (citing cases).

After reviewing the advertisements in the record and considering the secondary meaning associated with the use of the bright-pink magenta color in the industry and market at issue, the court concludes that Aio plum is similar to T–Mobile magenta and that Aio's use of large blocks or swaths of its plum color is similar to T–Mobile's use of its magenta color. This digit of confusion weighs in T–Mobile's favor.

Aio's use of different fonts and slogans, and of colors in addition to plum, does not detract from this finding and conclusion,[10] Aio's plum color, and Aio's use of broad

---

9. Not all advertising in the record supports this conclusion. Advertisements that ask consumers to "say goodbye to T–Mobile"—as opposed to those asking consumers to "say hello to Aio" should alleviate affiliation confusion. However, the record does not reflect the extent of advertisements asking consumers to leave T–Mobile and instead purchase from Aio.

10. In *American Rice*, Judge Smith dissented from a panel decision upholding the district court's conclusion that two competing marks were similar. 518 F.3d at 341. Using the "eyeball test," he thought that it was clear error to conclude that the marks were similar. American Rice's trademark pictured "a hatless Asian woman in a red kimono. In one hand she h[eld] a rice bowl, with the rice snugly in the bowl, and in her other hand [were] chopsticks. She appear[ed] to be wearing earrings. Her hair is smooth; her face, like her shoulders, is narrow." Rice Mill's mark was a "Girl with a Hat Design. It too has a woman, but she is not Asian. Her clothes are black. She is wearing something on her head, perhaps a hijab. Her shoulders arc reminiscent of Tim Tebow's. Both of her hands grasp the large, overflowing rice bowl. There are no chopsticks. Her collar is dis-

swaths or blocks of the plum color, is visually dominant in its marketing and confusingly similar to T–Mobile's magenta and its use of that color. Aio cannot defeat the trademark-infringement claim by pointing to other, dissimilar aspects of Aio's trade dress, particularly when the trade dress is so dominated by the plum color. The case *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir.2006), illustrates the point. In that case, the Second Circuit noted that Louis Vuitton did "not claim a separate trademark in the colors alone. If it were to claim such a trademark, it would be required to show that the [colors] create a separate and distinct commercial impression apart from the monogram motif design, and that the colors serve to indicate Vuitton as the source." *Id.* at 115. T–Mobile did just that. It claimed a separate trademark in the color and has shown that its use of the color creates a strong impression—a visual brand identifier—that serves as a source indicator in its industry. *See also Louboutin*, 696 F.3d at 218. Aio's argument is not about this color mark, but rather about the overall trade dress and "whether a combination of features creates a distinctive visual impression, identifying the source of the prod-

uct." *Sunbeam Prods.*, 123 F.3d at 251 n. 3. This argument does not respond to or meet T–Mobile's claim that given the role of color in this industry, Aio's use of large monochromatic blocks of plum is so similar to T–Mobile's use of magenta as to create a likelihood of affiliation confusion with the color mark alone. A "usual purchaser . . . would be likely to think [Aio's services] had some connection" with T–Mobile. *Sun–Maid Raisin Growers of Cal. v. Sunaid Food Products, Inc.*, 356 F.2d 467, 469 (5th Cir.1966).

The court finds and concludes that the marks are similar. *See McCarthy* § 7:45.70 ("However, the Supreme Court rejected the shade confusion argument as a sufficient rationale underlying the traditional ban on a single product color as trademark. The practical problem of resolving an issue of shade confusion was said by the Court to be no more difficult than determining whether differences in word marks would cause a likelihood of confusion." (citing *Qualitex*, 514 U.S. at 167–68, 115 S.Ct. 1300)).[11]

### G. Actual Confusion

■■■■■ "Actual confusion need not be proven, but if consumers have confused

---

similar. Her hair is wavy, not smooth. . . . Her round face with toothy smile looks straight-on, like a mug shot," *American Rice*, 518 F.3d at 342. While reasonable people might reasonably disagree on the application of a test as subjective as the "eyeball test," Judge Smith's concerns do not apply to this record. T–Mobile has shown secondary meaning in its magenta color. Color serves as a foundational marketing element in this industry. And the similarity of the products and services, the customers sought, and the uses of the color between Aio and T–Mobile make a side-by-side comparison of samples of the colors inadequate to capture the risk of initial-interest confusion.

**11.** *See also McCarthy* § 7:45.70 ("Some courts blithely assume that because there are hundreds of scientifically identifiable shades,

consumers can distinguish between them to identify hundreds of different commercial sources by fine variations in shade and that therefore colors will never be depleted and no one will be confused. In the author's opinion, this is an unrealistic view. . . . Anyone who has gone shopping in a paint store and been unable to distinguish between fine variations of shades will appreciate the attitude of a judge or juror asked to find that "yellowish red" does not infringe "bluish red." . . . If the decision maker thinks that the ordinary purchaser or user will see the color as a source indicator, and see them as close enough as to be likely to confuse source of affiliation, then infringement will be found even though the color shades are not identical.")

the junior mark for the senior mark, this is 'the best evidence of likelihood of confusion.'" *Xtreme Lashes,* 576 F.3d at 229 (quoting *Bd. of Supervisors,* 550 F.3d at 483). "'Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.'" *Id.* (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971)). The Fifth Circuit has advised district courts not to ignore competent actual-confusion evidence. *See id.* "In no case [has the Fifth Circuit] sanctioned total disregard of evidence of actual confusion; there is simply no precedent for such a view...." *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 597 (5th Cir.1985). The Fifth Circuit has affirmed a district court's bench-trial finding of actual confusion based on a single known instance of actual confusion. *See Xtreme Lashes,* 576 F.3d at 231. (citing *Louisiana World Exposition, Inc. v. Logue,* 746 F.2d 1033, 1041 (5th Cir.1984)). "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys." *Scott Fetzer,* 381 F.3d at 486.

"Actual confusion that is later dissipated by further inspection of the goods, service, or premises, as well as post-sale confusion, is relevant to a determination of likelihood of confusion." *Elvis Presley Enters.,* 141 F.3d at 204 (quotations omitted). But "infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion." *Id.* Initial-interest confusion "gives the junior user credibility during the early stages of a transaction and can possibly bar the senior user from consideration by the consumer once the confusion is dissipated." *Id.* (citation omitted).

Factors that weigh against finding actual confusion include the frequency of actual confusion compared to the period the junior user allegedly made sales under the offending mark. *See id.* "An absence of, or minimal, actual confusion, ... over an extended period of time of concurrent sales weighs against a likelihood of confusion. *Id.* The "fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future." *Amstar,* 615 F.2d at 263 (citing *FS Services, Inc. v. Custom Farm Services, Inc.,* 325 F.Supp. 153, 162 (N.D.Ill.1970), *aff'd,* 471 F.2d 671 (7th Cir.1972)). When there were concurrent sales over a 17-month period with no evidence of actual confusion, the plaintiffs' "inability to point to a single incident o actual confusion [was a] highly significant" factor in the defendant's favor. *Oreck Corp. v. U.S. Floor Sys., Inc.,* 803 F.2d 166, 173 (5th Cir.1986).

Aio argues that the court should find no likelihood of confusion based on the lack of evidence of actual confusion. But the law does not require such evidence. And the expedited nature of this suit made it unlikely that T–Mobile could produce such evidence, given the short amount of time since Aio began competing with T–Mobile. *See Elvis Presley,* 141 F.3d at 204 ("Approximately one year after the Richmond location opened, EPE's suit against the Defendants was reported in the press, and this lessens the weight of the lack of complaints[.]"). The period here is markedly shorter than *Amstar's* 15 years or *Oreck's* 15 months. *See id.*

Despite the short time between Aio's entry into the market and this suit, there is some record evidence suggesting actual confusion. T–Mobile submitted the expert

report of Dr. Bruce Isaacson, a *Survey Measuring the Likelihood of Confusion Between Aio and T–Mobile*. (Docket Entry No. 20–5). In that survey, Dr. Isaacson used a test image of an Aio wireless store that shows the "Aio wireless" logo on the front door; the large, black "Aio" sign at the back of the store, a hanging window sign that has "Aio" in white on the bottom right corner; and a large plum coverage map on the wall. After initial filtering questions, the survey asked respondents: "If you have an opinion, what company do you believe operates this store? If you don't know or have no opinion please check the box." Surprisingly, despite the 3 clear "Aio" labels in the test image, more than 75% of respondents did not choose Aio. Only 24.2% of the respondents identified Aio as the company that operated the store, fewer than the 25.1% who answered T–Mobile, and fewer than the 27.7% who answered that they did not know. In response to the follow-up question, "What makes you think that?" 31.6% of respondents identified the color of the store as the reason. Responses that mentioned the color included "the colors of the store," "the color scheme," "colors," and "the pink." The same percentage of respondents who correctly identified Aio as the store operator explained that the text, name, or what the signs said made them think that Aio owned the store. This survey shows that the predominant use of the plum color influenced respondents to believe the store was affiliated with T–Mobile despite large signs displaying the Aio name on the front door and the back wall.

Of those respondents who thought T–Mobile operated the store, 94.8% mentioned the color as the reason. Statements from those respondents included "the colors and the overall look," "They use pink in the logo," "The colors," "because it's pink," "the Pink is their signature color," "mostly because of the pink color. It's

vibrant and I immediately looked for something that said T–Mobile," "I'm just saying that based on the Pink!" With respect to affiliation or connection confusion, 41.6% answered that they thought whoever operated the store was affiliated or connected with another company. Of this 41.6 %, 11.3% believed that T–Mobile was affiliated with the store. Dr. Isaacson concluded that 26.3% of respondents confused the Aio store with a T–Mobile store.

Aio argues that Dr. Isaacson's survey was flawed because the test stimulus did not accurately represent how the stores look. The factual basis of that argument is that the test stimulus did not capture the exterior "Aio" sign and the picture was taken at night with the overhead lights turned off. To support its argument, Aio submitted the consumer-survey report of Dr. Peterson, who used a test stimulus that "turned off the backlit sign and greyed out carpet tiles" and added more signs in the windows. This replicated changes Aio made to its stores during this litigation. Aio has not adequately explained how the addition of the outside top sign would have changed the outcome, given the fact that Dr. Isaacson's survey prominently displayed two large signs with the Aio name.

Dr. Peterson's survey is also flawed. Respondents saw an "exaggerated close-up of the overhead 'Aio' sign" and then had to "scroll down more than two dozen times before they could see a complete view of the store window." (T–Mobile Reply Br. at 16). The survey segmented the test stimulus: the respondents would see a large closeup of the Aio exterior sign standing alone and then have to scroll down to see the inside of the store. The result is summarized neatly by one respondent's answer to the "What makes you think that?" question: "The big ass sign on the building that says AIO Wireless."

(Docket Entry No. 89–15, Peterson Depo. at 114).

Dr. Peterson conceded at his deposition that overemphasizing source indicia could affect survey validity. (Peterson Depo. at 56). He also conceded that not showing the stimulus in its entirety would be inappropriate. Dr. Peterson agreed that it would inappropriate if "consumers saw in one glimpse only the overhead sign and the awning because that would not be showing the stimulus in its entirety." (*Id.* at 130). Dr. Peterson himself appears to acknowledge that the survey was flawed by an incomplete, segmented, and nonrepresentative test stimulus. The evidence in the record showing segmented exposure to Dr. Peterson's test stimulus undermines the reliability of his survey.

The changes Aio made to its stores' appearance after this suit are discussed in more detail below. But the changes do not invalidate Dr. Isaacson's survey to the extent it demonstrates that Aio's dominating use of large blocks of plum in its marketing created confusion with T–Mobile.

Aio's attack on Dr. Isaacson's use of green as a control stimulus also fails to undermine the reliability of his survey. Aio argues that the "control should be as close to the infringing use as possible, i.e., as close as possible to plum without infringing." Aio cites Dr. Howard's report, which contains that assertion without explanation or citation. (Howard Report ¶ 17.) Moreover, Dr. Peterson stated that a control image that could possibly be infringing contradicts the reasons for having a control color in the first place. Addi-

tionally, Dr. Peterson stated that he did not know whether his control color might have been close too close to an infringing color because he was told to use purple as the control. One respondent to his survey stated that the control stimulus "reminded her of T–Mobile." (Peterson Depo. 170–77). Aio's submissions and statements from its experts appear to undermine the basis for its color-stimulus argument.

Aio also argues that green was an inappropriate control color because the competing wireless company Cricket uses green as its color. But fewer than 10% of the respondents associated green with that company. (Howard Report ¶ 18). Aio's submissions have not shown that Dr. Isaacson's color choice undermined his survey or that the court should reduce the weight given to his report.[12]

In addition to Dr. Isaacson's report, T–Mobile discovered and presented evidence that members of a focus group Aio used commented on aspects of Aio's advertising that reminded them of T–Mobile. This is anecdotal evidence of confusion; the focus-group results indicated that the colors initially made members think of T–Mobile. This focus-group reaction is anecdotal confirmation of other evidence supporting an inference of actual confusion, but is not itself competent consumer-survey evidence.[13]

The court finds that Dr. Isaacson's survey result that 26.3% of respondents were confused and the anecdotal responses from the focus-group testing provides some support for finding actual confusion. *See Tiffany & Broadway, Inc. v. Comm'r of Pat-*

---

**12.** Aio argues that the Dr. Isaacson's use of the internet was misplaced and relies on the report of Dr. Tarr and Dr. Berns. For the reasons previously stated, these arguments are unpersuasive reasons to discount the survey.

**13.** Aio argues that by the end of the commercials, the focus-group members realized that it was not a T–Mobile commercial, but another brand. This argument does not address the initial-interest confusion and affiliation confusion arguments that T–Mobile asserts.

*ents and Trademarks,* 167 F.Supp.2d 949 (S.D.Tex.2001) (finding 15% confusion significant). The digit of confusion weighs in T–Mobile's favor. Aio's suggestion that Dr. Isaacson's survey and the anecdotal evidence from Latin Works should be given no weight as evidence of actual confusion because the respondents were not actual market-place consumers overlooks the case law using surveys and anecdotal evidence for this purpose. *See Scott Fetzer,* 381 F.3d at 487 ("To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys." (internal citations omitted)); *see also Exxon Corp.,* 628 F.2d at 506–07 (concluding under "actual confusion" point heading that a "survey indicated that there [was] a high possible confusion level between Texon and EXXON."); *Amstar,* 615 F.2d at 264–65 (considering but rejecting particular surveys in establishing actual confusion); *Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513, 1549 (S.D.Tex. 1996) ("After considering the survey [of past customers] as a whole, the Court finds the evidence of confusion ... credible and probative of actual confusion."), *aff'd* 155 F.3d 526, 545 (5th Cir.1998) ("After reviewing the record, we cannot say that the district court committed clear error in finding actual confusion and in finding a likelihood of confusion based partially upon that actual confusion[.]"). The actual confusion digit of confusion weighs in T–Mobile's favor.

### H. Summary

Considering the digits of confusion, the court finds and concludes that T–Mobile has demonstrated a likelihood of success on the merits of its claim that Aio's use of large blocks or swaths of Aio plum as a foundation of its visual identity in advertisements, promotional materials, its website, and its stores violates the Lanham Act. T–Mobile has shown that the digits of confusion weigh in favor of concluding that there is a substantial likelihood of success on the merits of this claim.

### VII. Irreparable Harm

T–Mobile argues that it will be irreparably harmed by Aio's continued confusing use of its plum color because it has no control over Aio's quality and because sales will be diverted from T–Mobile, ultimately causing loss of customer loyalty and future sales. Expansion and continued advertising will affect T–Mobile market share in ways that monetary damages cannot compensate. Aio responds by arguing that there is no presumption of irreparable harm in the trademark context and that T–Mobile has failed to show that it will lose customer goodwill. Finally, Aio argues that monetary damages can compensate any loss of good will. In reply, T–Mobile contends that establishing a substantial likelihood of success on its confusion claim shows an irreparable injury.

■ Recently, in a Lanham Act case considering a permanent injunction, the Fifth Circuit noted that " '[a]ll that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion—injury is presumed.' " *Abraham v. Alpha Chi Omega,* 708 F.3d 614, 627 (5th Cir.2013) (quoting 5 McCarthy on Trademarks and Unfair Competition § 30.2 (4th ed.2001)). The Fifth Circuit stated that "there seems little doubt that money damages are 'inadequate' to compensate [the owner] for continuing acts of [an infringer]." *Id.* Based on the record evidence that led to the finding and conclusion that T–Mobile has demonstrated a substantial likelihood of success on its unfair competition and confusion claims, the court finds and concludes that monetary damages will not adequately compensate T–Mobile and that

T–Mobile will be irreparably harmed by Aio's continued use of large swaths or blocks of its plum color to identify and market its brand. *See Abraham*, 708 F.3d at 627.

The record is clear that Aio wanted to capture T–Mobile customers. Through consumer-survey analysis and through Aio's own focus-group testing, T–Mobile has presented credible evidence demonstrating that Aio's use of broad swaths or blocks of Aio plum is likely to, and, at least in some instances, actually did, cause initial-interest confusion. The continued use of large blocks of plum is likely to cause irreparable harm to the good will and brand identity that T–Mobile has spent billions of dollars creating since it arrived in the United States. This court finds a substantial likelihood of irreparable injury.

Aio argues that the Supreme Court abolished the presumption of irreparable harm in Lanham Act cases. (Docket Entry No. 76 at 47 (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006))). *Winter* was not a trademark-infringement case. That case involved claims under the National Environmental Policy Act of 1969. The district court and Ninth Circuit held that after the plaintiff showed a likelihood of success on the merits, a "preliminary injunction may be entered based only on a 'possibility' of irreparable harm." *Winter*, 555 U.S. at 21, 129 S.Ct. 365. The Supreme Court concluded that this "possibility standard" was "too lenient" and that the "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." The more relaxed standard would reduce an "extraordinary remedy" to an ordinary one. *Id.*

In *eBay*, the Supreme Court rearticulated the "historical" standard that district courts must use before awarding permanent injunctive relief to a prevailing plaintiff and applied that "traditional test" to disputes arising from the Patent Act. 547 U.S. at 390, 126 S.Ct. 1837. For a permanent injunction to issue, the plaintiff must establish "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 391, 126 S.Ct. 1837 (citations omitted).

After *eBay*, the Fifth Circuit in *Paulsson Geophysical Services, Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir.2008), considered whether showing a likelihood of confusion presumptively shows a substantial threat of irreparable harm. The court did not decide the question. In *Paulsson*, the Fifth Circuit noted this court's conclusion in a Lanham Act case that " '[w]hen likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of the goods or services.' " *Id.* (citing *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., LLC*, 83 F.Supp.2d 810, 831 (S.D.Tex.1999) (Rosenthal, J.)). The Fifth Circuit recognized that although it had not expressly decided the issue, most circuits before *eBay* had concluded that a court may presume irreparable injury after finding a likelihood of confusion in a trademark case. *Id.*[14] The

---

**14.** *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 129 (2d Cir.2004); *Ty, Inc. v.* *Jones Group, Inc.*, 237 F.3d 891, 902 (7th Cir.2001); *GoTo.com, Inc. v. Walt Disney Co.*,

Fifth Circuit then recognized that since *eBay*, the Eleventh Circuit had decided *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir.2008), which called the presumption into doubt but did not abandon or reject it. *Paulsson*, 529 F.3d at 312. The Fifth Circuit again declined to decide the issue.

Since *Paulsson*, the First Circuit has also called the presumption into question without abandoning or rejecting it. *See Voice of the Arab World, Inc. v. MDTV Med. News. Now, Inc.*, 645 F.3d 26, 34 (1st Cir.2011) ("[W]e do not address whether our previous rule, relied upon by the district court, i.e., that a trademark plaintiff who demonstrates a likelihood of success on the merits creates a presumption of irreparable harm, is consistent with the traditional equitable principles. In other words, we decline to decide whether the aforementioned presumption is analogous to the general or categorical rules rejected by the Supreme Court in *eBay* "). Other circuits have expressly abandoned the presumption in light of *eBay*. *See Herb Reed Enters. LLC v. Fla. Entm't Mgnt., Inc.*, 736 F.3d 1239, 1249 (9th Cir.2013) ("We now join other circuits in holding that the *eBay* principle—that a plaintiff must establish irreparable harm—applies to a preliminary injunction in a trademark infringement case." (citing *N. Am. Med. Corp.*, 522 F.3d at 1228)).[15]

Although most circuits have questioned or rejected the presumption, the Fifth Circuit decided a case less than a year ago

that appeared to endorse it. In *Abraham*, 708 F.3d at 627, the Fifth Circuit noted that an injunction against infringement may issue once a likelihood of confusion is shown because irreparable injury is then presumed. *See Abraham*, 708 F.3d at 627. A district court in this circuit used *Abraham* to conclude that the presumption survived *eBay* in Lanham Act cases. *See Clearline Techs. Ltd. v. Cooper B–Line, Inc.*, 948 F.Supp.2d 691 (S.D.Tex.2013) (Ellison, J.) ("The Court's decision in *eBay* . . . certainly casts doubt on prior case law suggesting that trademark or trade dress infringement constitutes irreparable injury as a matter of law. However, more recently, the Fifth Circuit indicated that presuming irreparable injury [in] Lanham Act cases remains appropriate." *Id.* (citing *Abraham*, 708 F.3d at 627).)

The case law suggests that in this circuit, in a Lanham Act case, the presumption is somewhere between shaky and reaffirmed. It is also unclear whether the presumption applied in a patent infringement case such as *eBay* may be distinguishable from presuming harm in a case based on unfair competition under the Lanham Act. Under the Lanham Act, the presumed irreparable harm arises primarily from the plaintiff's lack of control over the quality of the defendant's confusingly similar goods or services, regardless of their actual quality. Confusion gives rise to a different type of harm than the infringement the court addressed in *eBay*.

---

202 F.3d 1199, 1209 (9th Cir.2000); *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir.1999); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir.1998); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir.1992); *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 n. 7 (8th Cir.1980).

**15.** The Ninth Circuit's reliance on *North American Medical Corporation* seems misplaced because the Eleventh Circuit in that case "decline[d] to express any further opinion with respect to the effect of *eBay* on [the] case [and] declin[ed] to decide whether the district court was correct in its holding that the nature of the trademark infringement gives rise to a presumption of irreparable harm." *N. Am. Med. Corp.*, 522 F.3d at 1228.

T–Mobile has established a likelihood of confusion. T–Mobile has shown a likelihood that potential customers will be confused into thinking that Aio is affiliated or associated with T–Mobile based on the confused association between Aio's use of its plum color and T–Mobile's similar use of its similar magenta color. Whether Aio offers lower-grade, equivalent, or superior products and services, T–Mobile has shown a substantial likelihood of an irreparable injury. In addition to T–Mobile's inability to control the quality or nature of Aio's products and services, T–Mobile's time, effort, and expense exerted to create and define its brand has been unfairly exploited. Monetary damages could not remedy T–Mobile's loss of future goodwill or customer loyalty.

The court is *not* ruling that finding a likelihood of confusion automatically results in finding irreparable injury and issuing an injunction unless the defendant shows that the case is exceptional. The narrow ruling is that based on the record evidence, the likelihood of confusion over source and affiliation in this market for no-contract wireless telecommunications services creates a substantial likelihood of injury that money damages cannot remedy. The products and services sold are fundamentally the same. What separates the companies is their brand identity. The evidence shows that color is a critical part of that brand identity. On this record, without presuming injury, this court finds and concludes that T–Mobile has shown a likelihood of irreparable injury absent an injunction against Aio's use of large blocks or swaths of plum in its marketing and stores.

### VIII. The Threatened Injury to T–Mobile Outweighs the Hardship to Aio from an Injunction

█ Aio argues that a preliminary injunction will require redesigning certain advertisements, websites, vehicles, promotional items, and its retail-store design, including walls, displays, uniforms, and signage. Aio presented cost projections for these changes. But in its post-hearing efforts to moot this case, Aio has implemented the lion's share of the changes it initially argued were too costly to require. The projections are now overstated. And the narrow scope of the injunction, which does not require Aio to abandon all uses of plum, as T–Mobile sought, reduces the impact of any remaining changes the injunction will require it to make. The harm to T–Mobile's brand, which it has spent billions of dollars and over ten years creating, substantially outweighs the remaining harms that Aio will suffer in stopping the use of large blocks or swaths of plum in its marketing and store appearance.

### IX. The Public Interest

█ "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Quantum Fitness Corp.,* 83 F.Supp.2d at 832 (citations omitted). Protecting T–Mobile in this case from an infringing junior competitor does not disserve the public's interest.

### X. Mootness

Aio has used its post-lawsuit marketing and store-design changes to argue that T–Mobile's consumer surveys and its need for an injunction are now moot. T–Mobile vigorously disputes this argument.

█ "A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Allied Home Mortg. Corp. v. Donovan,* 2012 WL 3276978, at *4 (S.D.Tex. Aug. 8, 2012) (citing *City of Mesquite v. Aladdin's*

*Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). "If it did, the courts would be compelled to leave [t]he defendant ... free to return to his old ways." *City of Mesquite,* 455 U.S. at 289, 102 S.Ct. 1070. "To further that principle, the standard for determining whether a case has been mooted by a defendant's voluntary conduct is stringent, and it is only met if 'subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Allied,* 2012 WL 3276978 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610).

Mootness does not prevent this court from issuing a properly tailored injunction. Aio has not pointed to evidence showing that the challenged conduct could not recur.

## XI. The Dilution Claim

T–Mobile also alleged that it was entitled to recover under the Trademark Dilution Act of 2006 ("TDRA"). T–Mobile argues that Aio dilutes the magenta color mark by "blurring." T–Mobile has not shown a substantial likelihood of success on this claim.

Under the TDRA, "the owner of a famous mark ... shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring...." 15 U.S.C. § 1125(c)(1). T–Mobile must show substantial likelihood that it would succeed on the merits of its claim that the magenta mark is "famous." Among other things, the TDRA requires that the mark be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner," 15 U.S.C. § 1125(c)(2).

■■■ "Fame for likelihood of confusion and fame for dilution are distinct concepts, and dilution fame requires a more stringent showing." *Coach Services, Inc. v. Triumph Learning LLC,* 668 F.3d 1356, 1373 (Fed.Cir.2012). "While fame for dilution is an either/or proposition—it either exists or it does not—fame for likelihood of confusion is a matter of degree along a continuum." *Id.* (quotations omitted). "It is well-established that dilution fame is difficult to prove." *Id.* This would be especially true where, as here, the function, role, and import of color marks changes across industries. *See id.* ("This is particularly true where, as here, the mark is a common English word that has different meanings in different contexts."). The plaintiff must show when "the general public encounters the mark in almost any context, it associates the term, at least initially, with the mark's owner." *Id.* (quotation omitted). That is, a famous mark has become a household name. *See id.* (citing *Nissan Motor Co. v. Nissan Computer Corp.,* 378 F.3d 1002, 1012 (9th Cir.2004)).

The record evidence does not support the conclusion that the magenta mark is widely recognized by the general public as a household name. The evidence does show that the mark is widely recognized in the niche market of wireless-telecommunications services. The fame-dilution survey that T–Mobile relies upon first told respondents: "Now we would like to ask you some questions about companies that offer wireless or mobile phone plans or services." (Butler Rpt. at 10). Respondents were then asked, "Are there any companies that come to mind that use a specific color when advertising or promoting their wireless/mobile plans or services?" If the respondents answered yes, then they would have to name the company or companies. Respondents were then shown a large square color and asked, "What com-

pany, if you know or have an opinion uses this color when advertising or promoting its wireless/mobile services or plans?" (*Id.* at 11). The results showed that 25.5% named T–Mobile without prompting and identified T–Mobile as using the color pink or a variation when promoting its services.

Butler also did an "association survey." The main questionnaire for this survey began with the following:

> On the next screen we are going to show you a photo of a store that sells mobile phone service. Please imagine you are interested in considering a mobile phone service provider and came across this store. Please take our time viewing the picture o the store. After you viewed the image you will then be asked some questions.

*Id.* at 15. After seeing the store, respondents were asked "What company or companies, if any, come to your mind based on the color(s) of this store? If you are thinking of more than one company or companies, please enter each one in a separate box below." (*Id.* at 16.) The respondents answered "T–Mobile" 41.2% of the time.

The introductory comments and the questions primed the respondents to think about color only as it related to the wireless-telecommunications industry. The survey did not test the general consuming public's association of the magenta mark with T–Mobile. This is insufficient evidence because the survey tested the telecommunications market, which the record demonstrates highly leverages the use of color marks. And 41.2% may not approach a sufficient showing to find fame in the general consuming public in the United States. One treatise proposes that fame responses should be around 75% of the general consuming public to support such a finding. *See* 4 McCarthy § 24:106.

Considering the other elements of fame that the statute allows the court to evaluate does not alter the conclusion that the record does not show that the magenta mark, as stand alone color, commands general household association with T–Mobile or that Pantone Process Magenta or T–Mobile magenta is a household name. The magenta mark, standing alone, is not like Budweiser beer, Camel cigarettes, Barbie dolls, Nike shoes, Rolex watches, Starbucks coffee, Pepsi soda, or Burberry plaid. *See, e.g.,* McCarthy § 24.107.

The court finds and concludes that T–Mobile has not met the stringent definition of fame that the TDRA contemplates. T–Mobile has failed to show a substantial likelihood of success on the merits of its TDRA claim.

### Conclusions of Law

The court enters the following conclusions of law:

- There is a substantial likelihood of success on the merits of T–Mobile's trade mark infringement claim under the Lanham Act. *See Paulsson Geophysical Servs., Inc. v. Sigmar,* 529 F.3d 303, 309 (5th Cir.2008).
 - T–Mobile's magenta mark (Pantone Process Magenta) is eligible for protection under the Lanham Act.
 - T–Mobile is that mark's senior user.
 - There is a likelihood of confusion between T–Mobile's use of magenta and Aio's use of plum (Pantone 676C) in marketing, advertising, and store designs.
- There is a substantial likelihood of irreparable injury to T–Mobile without adequate legal remedy if the injunction does not issue.
- T–Mobile's threatened injury if the court were to deny the injunction out-

weighs the harms to Aio should the injunction issue.

- The injunction will not disserve the public interest.
- T–Mobile has failed to establish a substantial likelihood of success on the merits of its TDRA claim and is not entitled to an injunction on that theory of liability.

This court grants T–Mobile's application for a preliminary injunction against Aio's use of large blocks or swaths of Pantone 676C and confusingly similar shades in its advertising, marketing, and store design. T–Mobile must post a $500,000 bond.

A status conference is set for **Monday, February 3, 2014 at 4:00 pm, EST.** The parties may appear by teleconference. The injunction will issue under separate order consistent with this opinion.